**AMERICAN LOUISIANA PIPE LINE COMPANY, Plaintiff**

v.

**GULF OIL CORPORATION, Defendant.**

**Civ. A. No. 16427.**

United States District Court
E. D. Michigan, S. D.

Dec. 30, 1959.

A. D. Ruegsegger, Detroit, Mich., Charles V. Shannon, Washington, D. C., Arthur R. Seder, Jr., Chicago, Ill., Dyer, Meek, Ruegsegger & Bullard, Detroit, Mich., Sidley, Austin, Burgess & Smith, Chicago, Ill., May, Shannon & Morley, Washington, D. C., of counsel for plaintiff.

Laurence M. Sprague, Fischer, Sprague, Franklin & Ford, Detroit, Mich., Merle E. Minks, Houston, Tex., Jesse P. Luton, Jr., Fort Worth, Tex., Charles E. McGee, Washington, D. C., of counsel, for defendant.

LEVIN, Chief Judge.

This is an action instituted by American Louisiana Pipe Line Company (hereinafter referred to as American Louisiana) against Gulf Oil Corporation (hereinafter referred to as Gulf), seeking a declaratory judgment (28 U.S.C. § 2201) that Gulf's cancellation of a contract entered into with American Louisiana in December 1955 was unlawful.[1]

American Louisiana is a Delaware corporation which owns and operates an interstate natural gas pipe line extending from the gas producing areas in southern Louisiana to Detroit, Michigan. Gulf is a Pennsylvania corporation which owns and operates natural gas wells, pipe-line facilities, gasoline plants and other properties in various states throughout the United States. The 1955 contract, details of which will be set out and discussed, provided for the sale of gas to American Louisiana from Gulf's Krotz Springs field located in St. Landry Parish, Louisiana, the reserves of which have an estimated value of over $100,000,000. The contract imposed obligations upon each of the parties to be performed within a given time, and provided that if either party did not satisfy its obligations within that time, the other party, at its option, could cancel the contract. American Louisiana in this action asserts that it fully performed its obligations and that Gulf therefore did not have the right to cancel. Gulf moved to dismiss on the ground that the action was local in nature and could only be tried in the United States District Court for the Western District of Louisiana and, in the alternative, moved to transfer the case to that District Court. This motion was denied. American Louisiana Pipe Line Co. v. Gulf Oil Corp., D.C., 158 F.Supp. 13. A motion for summary judgment by Gulf was also denied.

Although the present controversy involves a contract entered into in 1955,

1. The contract was actually entered into between American Louisiana and Gulf Refining Company, a wholly-owned subsidiary of Gulf Oil Corporation. Gulf Oil Corporation, however, acquired all the assets, with certain exceptions not involved in this action, and also assumed all the liabilities of the Gulf Refining Company prior to the suit.

the factual and legal issues require a consideration of the prior dealings between the parties with reference to the sale of the Krotz Springs gas.

On November 10, 1953, American Louisiana filed an application under Sec. 7 (c) of the Natural Gas Act, 15 U.S.C.A. § 717f(c), with the Federal Power Commission for a certificate of public convenience and necessity to construct and operate a natural gas pipe-line system from southern Louisiana to the Detroit area. The gas supply to support this project was to be provided by six independent producers of natural gas with whom American Louisiana had entered into gas purchase contracts covering gas reserves in southern Louisiana. One of these contracts entered into on October 26, 1953, covered the Gulf reserves in the Krotz Springs field. Under a provision of the contract Gulf had the right to terminate it if American Louisiana had not given notice to Gulf by October 1, 1954, that it had received a certificate of public convenience and necessity from the Federal Power Commission acceptable to Gulf or if any federal regulatory body took formal action to exercise or extend its jurisdiction to declare Gulf a natural gas company, or to regulate the price Gulf was to receive for the gas it delivered under the contract.

On June 7, 1954, while the American Louisiana certificate proceedings were in progress, the Supreme Court handed down its decision in Phillips Petroleum Company v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, holding that independent producers of natural gas who make sales to interstate pipe-line companies are natural gas companies subject to Federal Power Commission regulation under the Natural Gas Act. Pursuant to that decision, the Commission subsequently issued regulations requiring producers who were making interstate sales to apply for certificates of public convenience and necessity by December 1, 1954. This decision presented to the Commission the problem of how to deal with the American Louisiana certificate application. It was essential to the survival of the American Louisiana project that a certificate of public convenience and necessity be issued on or before October 1, 1954, since all of American Louisiana's contracts could be cancelled if American Louisiana had not by that time received the certificate. None of the producers had as yet applied for or received certificates authorizing the sales to American Louisiana. On October 1, 1954, the Commission issued an opinion and an accompanying order, granting a conditional certificate of public convenience and necessity to American Louisiana authorizing the construction of the facilities covered by its application, subject to the condition that American Louisiana could not undertake the construction of such facilities

"unless there have been filed with the Commission prior to December 1, 1954, applications for certificates of public convenience and necessity to supply gas sufficient to support this project, and until such certificates have been issued and accepted by the respective applicants."

The Commission's order of October 1, 1954, also included a condition limiting the quantity of gas which American Louisiana could transport and sell to 111,946,000 Mcf per year, being an average daily purchase capacity of 306,700 Mcf per day.[2] Following the issuance of this order, four of the six producers with whom American Louisiana had contracts filed applications with the Federal Power Commission for certificates of public convenience and necessity and after hearings thereon, the Commission issued certificates to them. Gulf and one other producer cancelled their contracts. Thereupon American Louisiana proceeded with construction of the project and the initial facilities were completed in August, 1956.

2. Gas is measured in terms of cubic feet related to a standard pressure and temperature. Mcf is the symbol for 1000 cubic feet of gas.

Article XX of the 1953 contract between American Louisiana and Gulf provided that in the event of the cancellation of the contract by Gulf,

"in order to allow Buyer [American Louisiana] sufficient time and opportunity to negotiate with Seller [Gulf] for a new contract, it is agreed that Seller shall not, for a period of two years from such termination, sell any gas from leases covered by this Agreement to any one, other than those to whom it now has written commitment without first having obtained written consent from Buyer, which consent shall be granted unless withheld for such reasonable cause."

Pursuant to this provision, American Louisiana and Gulf negotiated a new contract for the purchase and sale of the Krotz Springs reserves and on December 7, 1955, Gulf transmitted signed copies of the contract with which we are here concerned, to American Louisiana with a covering letter which stated that the contract would not become effective until American Louisiana executed similar contracts for the purchase of gas from three other fields owned by Gulf in southern Louisiana, known as Washington, Hayes and Church Point fields. American Louisiana executed the Krotz Springs contract on December 10, 1955, and in January and February of 1956 American Louisiana executed contracts covering the Washington, Hayes and Church Point fields as well as a fourth field also owned by Gulf known as West Little Chenier.

Following the execution of these contracts, American Louisiana on May 14, 1956, filed an application for a certificate of public convenience and necessity with the Federal Power Commission. American Louisiana's application sought authority to install additional compressor stations and additional compressor engines at its existing stations which would increase its daily delivery capacity from 300,000 Mcf per day to 400,000 Mcf per day. This was to be accomplished in two steps. The first step would increase the daily delivery capacity to approximately 360,000 Mcf per day, which is approximately 370,000 Mcf per day of purchase capacity, by the construction of two new compressor stations and the addition of horsepower at two existing stations. The second step would provide an additional capacity of 40,000 Mcf per day by the construction of two additional compressor stations. Gulf filed its application for a certificate of public convenience and necessity to make the deliveries under the contracts on the same day.

On July 13, 1956, the Federal Power Commission having not as yet acted on these certificate applications, American Louisiana filed an application for a temporary certificate of public convenience and necessity under Sec. 717f(c) of the Natural Gas Act in which it requested authority to construct and operate the first step facilities described in its permanent certificate application.

A temporary certificate granting the authority requested was issued on August 8, 1956. By virtue of this temporary certificate, the certificated purchase capacity of American Louisiana's pipe line was increased from 306,700 Mcf per day to approximately 370,000 Mcf per day. American Louisiana completed this construction in December of 1956 at a cost of approximately $8,000,000.

On August 20, 1956, the Commission set the Gulf and American Louisiana certificate hearings for October 9, 1956. On October 4, 1956, the Commission postponed the hearing set for October 9, 1956, to a date to be fixed by further notice. On October 11, 1956, American Louisiana filed a motion for prompt hearing on the certificate application and on October 19, 1956, Gulf filed a concurrence in this motion. The Commission granted the motion and set the hearing for November 14, 1956. The hearing on Gulf's application commenced on that date. On the following day, November 15, 1956, Gulf's counsel read into the record the text of a telegram that Gulf was sending to American Louisiana cancelling the Krotz Springs, Washington,

Hayes and Church Point contracts. On November 16, 1956, Gulf filed with the Commission a formal notice of the withdrawal of its application with respect to these contracts.[3] American Louisiana filed an answer and objections to Gulf's notice. On January 11, 1957, the Commission issued an order postponing action on Gulf's attempt to withdraw its Krotz Springs application, pending judicial determination of the rights of the parties under the 1955 Krotz Springs contract. American Louisiana wrote to Gulf requesting that Gulf withdraw its notice of cancellation. Gulf declined to do so and American Louisiana instituted this action.

Article V of the contract contains the provisions which must be construed to resolve this controversy.[4] Of the six sections of Article V, Sec. 5 which conditioned the obligations of Gulf upon American Louisiana's obtaining *"such authority as may be necessary to enable it to expand the certificated capacity of its line to accept and transport the quantities of gas to be purchased"* under the contract and Sec. 6 which gave the right to Gulf to cancel the contract if American Louisiana *"failed to obtain requisite authority within six months after making application therefor,"* are basic to this controversy.

■ Before proceeding further, I may say that American Louisiana's contention that a public interest is involved in this controversy and should affect the determination of the issue here is without merit. There is no overriding "public interest" inherent in this contract which prevented Gulf, regardless of motive, from exercising its termination privilege if it had a contractual right to do so. In my opinion, American Louisiana Pipe Line Co. v. Gulf Oil Corp., D.C., 158 F.Supp. 13, 16, denying Gulf's motion to dismiss, wherein I also denied the motion of the County of Wayne, Michigan, to intervene, I said:

"This controversy, unlike the Federal Power Commission proceedings, involves a dispute as to the terms of a contract between private parties and not a supervision of the nation's power resources. The gas-consuming public, therefore, is not an appropriate party in this proceeding."

Gulf's contention that the Krotz Springs contract and the contracts covering Washington, Hayes and Church Point fields are interdependent and that it was necessary in order to satisfy Sec. 5 for American Louisiana to secure authority to accept and transport the quantities of gas involved in all of these contracts by a single application is without merit. All four contracts were in fact executed in accordance with Gulf's covering letter to which I have previously referred. The contracts were interdependent with respect to that condition only.

■■ At the conclusion of the trial before me, Gulf filed a motion to amend its answer which was granted. Gulf in this amended answer takes the position that it was always its understanding that American Louisiana was obligated to secure a permanent certificate and if American Louisiana's interpretation of its obligation were otherwise, then there was no meeting of the minds, and therefore no enforceable contract. Conflicting expressions of subjective intent do not prevent the formation of a contract.

"Contracts are made by what parties say, and not what they intend to say. If one were permitted to avoid a bargain, fairly and clearly made, by the statement that he meant one thing when he said another, the obligation of contracts would be a myth." United States Potash Co. v. McNutt, 10 Cir., 70 F.2d 126, 129.

Judge Learned Hand nearly fifty years ago in Hotchkiss v. National City Bank of New York, D.C., 200 F. 287, 293, put it this way:

---

3. Gulf did not cancel the contract covering the sale of gas from its West Little Chenier field.

4. The six sections of Article V are set out in the appendix.

"If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort."

Gulf and American Louisiana reduced their agreement to writing. This writing is susceptible to interpretation under recognized rules of law. Neither party may avoid the consequences of such construction by stating that such was not its subjective understanding of the meaning to be given to the language used.

What was the obligation imposed upon American Louisiana by the agreement of December 7, 1955?

Gulf contends that the contract required American Louisiana to obtain a *"Certificate of Public Convenience and Necessity"* within six months after making application therefor. Since American Louisiana filed an application for such a certificate on May 14, 1956, but did not obtain this certificate by November 14, 1956, Gulf contends that Sec. 6 of the contract gave it the right to cancel.

The express language of Article V, Sec. 5 of the contract and the circumstances surrounding its adoption do not support this position. The term "certificate of public convenience and necessity" appears in Sec. 717f of the Natural Gas Act. It is a well-known and widely used term in the industry. If the parties had intended that Gulf's obligations under the contract be conditioned upon American Louisiana securing this statutory authority, it would seem that they would have used the statutory term rather than the language employed. Indeed, when the parties intended that a certificate of public convenience and necessity be obtained they so specifically provided. For example, Sec. 1 of Article II of the 1953 Krotz Springs contract obligated American Louisiana to proceed with due diligence "in an endeavor to procure a certificate of public convenience and necessity". Sec. 2(a) of Article II of that

contract gave Gulf the right to cancel the contract if American Louisiana failed to procure the certificate required by Sec. 1 on or before October 1, 1954. The 1953 contract also gave American Louisiana the right to cancel if a "certificate of public convenience and necessity for the construction and operation of the new pipe-line system" had not been granted to it by October 1, 1954. (Sec. 2(b) of Article II.) And Sec. 3 of Article II provided that the construction of facilities was to proceed "upon Buyers procuring said certificate of public convenience and necessity."

Specific reference to a certificate of public convenience and necessity also appears in the contract now in controversy but only with reference to the obligation of Gulf. The contract refers to the fact that American Louisiana was in the process of constructing a new pipeline system "pursuant to authority contained in the Certificate of Public Convenience and Necessity granted to Buyer [American Louisiana] by the Federal Power Commission on October 1, 1954." Sec. 3 of Article V obligated Gulf to file and *"prosecute with due diligence an application for a Certificate of Public Convenience and Necessity"* (emphasis added), whereas Sec. 5 of the same article required American Louisiana merely to file and *"prosecute with due diligence an application for such authority as may be necessary to enable it to expand the certificated capacity of its line."* (Emphasis added.) The 1953 and 1955 contracts were both comprehensive documents and the product of competent and skillful draftsmanship. Many of its provisions were negotiated, compromised and revised. There is no basis for assuming that the difference in phraseology of Sec. 3 which relates to the authority to be obtained by Gulf as compared with that of Sec. 5 which defines the obligation of American Louisiana was adopted without a purpose. It is not the function of a court under the guise of construction to add words to a contract which are not to be found in it. The words "permanent certificate of public convenience

162

and necessity" are not to be substituted for the phrase "such authority as may be necessary to enable it to expand the certificated capacity of its line".

The temporary certificate satisfied American Louisiana's obligation to secure such authority as was "necessary to enable it to expand the certificated capacity of its line to accept and transport the quantities of gas to be purchased hereunder". Prior to the issuance of the temporary certificate of August 8, 1956, American Louisiana was restricted to an average purchase capacity of 306,700 Mcf per day. Its purchase obligations under existing contracts did not exceed 307,690 Mcf per day. The temporary certificate of August 8, 1956, authorized the construction and operation of facilities having a purchase capacity of approximately 370,000 Mcf per day. Thus after the issuance of the temporary certificate American Louisiana had a certificated purchase capacity of more than 62,000 Mcf per day in excess of its original certificated capacity. By the terms of the Krotz Springs contract (Articles III and IV) American Louisiana was obligated to take gas not in excess of 25,000 Mcf per day until April 1, 1959, and not in excess of 35,000 Mcf per day from April 1, 1959, through April 1, 1961, with an ultimate obligation by American Louisiana to accept about 50,000 Mcf per day after April 1, 1961. Since American Louisiana's purchase capacity by virtue of the temporary certificate was approximately 62,000 Mcf per day in excess of its existing obligations under contracts entered into prior to the execution of the Krotz Springs contract American Louisiana had the authority to "accept and transport the quantities of gas to be purchased" under the Krotz Springs contract.

Gulf asserts, however, that since the temporary authorization was issued "without prejudice to such ultimate disposition of the certificate as the record may require" this authorization lacked the permanency necessary to fix the obligations of the parties and, therefore, did not satisfy American Louisiana's obligation under Sec. 5 of the contract.

Sec. 717f(c) of the Natural Gas Act permits the Commission to "issue a temporary certificate in cases of emergency, to assure maintenance of an adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate * * *". While in theory the authority granted by a temporary certificate may be withdrawn by the Commission, in the experience of the industry such authority in effect constituted permament authority to employ the authorized facilities, and the natural gas industry has undertaken projects involving many millions of dollars pursuant to authority granted by such temporary certificates. In fact, American Louisiana, as I have earlier stated, in reliance on its temporary authorization constructed facilities of the value of $8,000,000.

The character and significance of a temporary certificate has been effectively spelled out by the Subcommittee on Legislative Oversight of the House Committee on Interstate and Foreign Commerce. At a hearing of the Subcommittee held on November 14, 1958, after it was disclosed that over 600 billion dollars of construction had been authorized under temporary certificates, John Bell Williams, Acting Chairman of that Subcommittee, stated:

"Since many of the temporary certificates included in the Staff study authorized multi-million-dollar construction projects, it is folly to think that the Federal Power Commission would, and it has never ordered the destruction of such projects. Therefore, if a temporary certificate is granted, a permanent certificate is just about certain to follow."

Up to the time of the execution of the 1955 contract the Commission once having authorized the construction of facilities to transport gas had not subsequently ordered such facilities aban-

doned.[5] It must be assumed that Gulf as well as American Louisiana was aware of the practices of the Commission. Therefore it is clear that if Gulf intended that its obligation to sell gas to American Louisiana should be conditioned on the obtaining by American Louisiana of a "permanent certificate of public convenience and necessity" it would have so provided as it had in the 1953 contract with American Louisiana and as it did with reference to its own obligation in this contract.

■ Gulf also argues that inasmuch as American Louisiana justified its application for a temporary certificate on the basis of reserves other than Gulf's reserves, American Louisiana "could have at any time taken the position that it did not have authority to take all or any of its gas" and for this reason, too, the temporary certificate did not satisfy American Louisiana's obligation under Sec. 5. It is true, as contended by Gulf, that in its application for a temporary certificate American Louisiana did not rely on the Krotz Springs reserves, but this fact does not justify the conclusion that American Louisiana could have taken the position that it did not have the authority to take Gulf's gas and was not obligated to pay for such gas. Sec. 5 did not require that American Louisiana secure authorization to increase its certificated capacity in reliance on Gulf's reserves. It merely required that American Louisiana increase the certificated capacity of its pipe line over its then existing contract obligation by an amount sufficient to permit it to transport the volume of gas it was obligated to take under the Krotz Springs contract. This the temporary certificate accomplished. That Sec. 5 merely required an increase of American Louisiana's certificated capacity over its then existing contractual obligations is also apparent when it is recognized that the Commission, when it authorizes additional capacity, does not allocate any specific gas to newly author-

ized facilities. If a pipe line has sufficient physical and certificated capacity it is not required to seek authority to transport gas from any particular producer. The temporary certificate viewed in terms of substance and practical effect satisfied American Louisiana's obligation under Sec. 5 of Article V of the contract.

I think it may be well to make the following additional observations. The Commission, as heretofore stated, issued the temporary certificate on August 8, 1956. On August 20, 1956, a notice entitled "Notice of Application and Date of Hearing" was sent to both American Louisiana and Gulf notifying them that the Gulf and American Louisiana applications had been consolidated for hearing. The notice also stated that "On July 13, 1956, American Louisiana filed an application for temporary authorization to proceed with 'Step one' of its construction program, and temporary authorization therefor was granted by the Commission on August 8, 1956". Gulf thus had official notice that American Louisiana had received a temporary certificate. Gulf was also informed by telephone on July 17, 1956, by a vice president and director of American Louisiana that:

> " * * * American Louisiana had done everything that, in my opinion anyway, it was required to do, and that we would be ready to take their gas from Krotz Springs within thirty days after Gulf received its authority".

In addition in its "Motion for Prompt Hearing" filed on October 11, 1956, American Louisiana stated that pursuant to the temporary authorization it had gone forward with the construction of the additional facilities and they were then substantially completed and scheduled to be placed in operation by about November 15, and that "Gulf's interest in the Krotz Springs field will be utilized as a principal source of gas supply

---

5. In its brief Gulf cites two cases wherein the Federal Power Commission did not issue a permanent certificate after granting temporary authority. However, not only are these cases atypical factually but, more basic, both cases were processed subsequent to the execution of the 1955 contract.

for these new facilities." American Louisiana in its motion also stated that "American Louisiana can complete this construction and commence the purchase of gas from that field within 30 days after Gulf is granted a certificate in these proceedings." In the light of this record American Louisiana could not have asserted, meritoriously, that it did not have the authority to take the Krotz Springs gas.

Independently of the question whether the temporary certificate satisfied American Louisiana's obligation under Sec. 5 of the contract, Gulf asserts that American Louisiana lacked authority to build a 25.2 mile lateral line from Lewisburg to the Krotz Springs field and that the failure to secure such authority permitted it to terminate the contract.

A determination of this question also requires a review of the events preceding the execution of the 1955 contract. The original project for which American Louisiana sought authority when it filed its certificate application on November 10, 1953, included a 30-inch pipe line from North Tepetate, Louisiana, to Detroit, Michigan; a 24-inch lateral line from Krotz Springs to North Tepetate (Lewisburg is 19.5 miles from North Tepetate); a 24-inch line from Lowry, Louisiana, to North Tepetate; and a 22-inch tie-line extending from the 30-inch line near Payne, Ohio, to a point of connection with Michigan Wisconsin pipe line at Bridgman, Michigan. In its opinion and accompanying order issued October 1, 1954, the Federal Power Commission issued a certificate of public convenience and necessity to American Louisiana to construct the facilities described in American Louisiana's application. During the negotiations which led to the execution of the contract American Louisiana took the position that it had the authority to build the lateral from Lewisburg to Krotz Springs by virtue of the order of 1954. It is, however, unnecessary for me to decide whether American Louisiana actually did have this authority inasmuch as I find nothing in the contract that conditions Gulf's performance of the contract upon American Lou-

isiana's securing authority to build this lateral. It is to be remembered that during the contract negotiations American Louisiana recognized that since its certificated capacity was limited to 306,-700 Mcf per day it did not have the authority to take the quantities of gas available to it under the proposed contract. It, therefore, insisted that its take or pay obligation be conditioned upon its obtaining "such authority as may be necessary to expand the certificated capacity of its line * * * ". The requisite authority in Sec. 5 has reference solely to "certificated capacity". Sec. 5 did not obligate American Louisiana to secure any authority to build the Krotz Springs line. Since it was American Louisiana's understanding that it had the authority to build this lateral, it is readily apparent why American Louisiana did not believe it necessary to condition its take or pay obligation upon its securing such authority. Gulf's reliance upon the failure of American Louisiana to apply for and secure authority to build the Krotz Springs line as a basis for termination is not valid.

██ In any event, Gulf must be precluded from exercising its right to cancel, even if its own interpretations of the contract were adopted, since Gulf by its own conduct delayed the certificate hearings and thus prevented the probability of the issuance of a certificate to American Louisiana within the prescribed period.

While there are statements in the record that the hearing on the pending application for a permanent certificate was delayed by the Commission's crowded calendar and the heavy workload of its staff, a review of all the evidence indicates that Gulf's conduct subsequent to the execution of the Krotz Springs contract was responsible for the delay in processing American Louisiana's and Gulf's certificate applications. Gulf, in its first draft of the 1955 contract, included the following provision:

> "In the event the Natural Gas Act is not amended to exempt independent producers of natural gas from the jurisdiction of the Federal Pow-

er Commission, as contemplated by H.R. 6645, introduced in the first session of the 84th Congress of the United States, then this contract may be terminated at Seller's option on or after January 1, 1957, by giving ninety (90) days written notice to Buyer, unless the Federal Power Commission shall have made a finding, after notice to interested parties and hearing, that the initial price set forth in Section 1 of Article X hereof is just, fair and reasonable and any appeal therefrom shall have affirmed said finding and become final."

American Louisiana refused to accept this provision because it felt that to request the Commission to make a finding that the initial price was "just, fair and reasonable" would prejudice and possibly delay the certificate applications. A vice president of Gulf, in charge of Gulf's Houston Production Division, in writing to his superior at Gulf's Pittsburg Office, stated:

"We are inclined to agree that the escape clause as now written would jeopardize their chances of obtaining a Certificate and the necessary financing. Also, it is doubtful that our sale to American Louisiana would be certified without some modification of this clause".

Gulf thereupon agreed to revise this clause. As finally adopted the clause (Article V, Sec. 3) reads as follows:

"It is agreed, however, that, unless such a certificate is no longer legally required, this agreement may be terminated by Seller upon written notice given by Seller to Buyer in the event the Federal Power Commission issues Seller a Certificate of Public Convenience and Necessity containing conditions which are unsatisfactory to Seller".

On May 14, 1956, Gulf filed its certificate application. The application condi-

tioned Gulf's obligation to sell its gas to American Louisiana upon an expressed finding by the Commission that the initial price set forth in the Krotz Springs contract was "just, fair and reasonable". The provision in its entirety reads as follows:

"Applicant is able to make the sales referred to herein and is willing to make such sales provided the Federal Power Commission finds in its order or opinion issuing a certificate to applicant that the initial price set forth in the aforementioned gas sales contract dated December 7, 1955, is just, fair and reasonable".

In view of American Louisiana's refusal to accept the escape clause as originally drafted by Gulf, and in view of the recognition by Gulf that the clause as originally drafted would tend to jeopardize American Louisiana's chances of obtaining a certificate, I interpret Sec. 3 of Article V as denying to Gulf the right to condition its obligation to sell gas upon the approval of the initial contract price by the Commission. When Gulf agreed to the revision of the escape clause it became obligated to file a routine ordinary application—an application that would not inject the price determination issue into the certificate proceedings.

American Louisiana expressed concern repeatedly to Gulf that the inclusion of the provision requiring an affirmative finding by the Commission that the initial price was "fair, just and reasonable" would probably prolong the certificate applications and tried unsuccessfully to persuade Gulf to delete it. Gulf knew or should have known that the usual producer certificate application is processed rapidly,[6] whereas a producer application demanding a price determination would be of indeterminate length because of the wide range of evidence necessary to support the price determination and the fact that the Commission had not as yet determined applicable standards to judge

---

6. The Commission's annual report to Congress for the fiscal year 1956 shows that 98 per cent of the independent producer certificate applications were handled pursuant to the Commission's non-contested hearing regulations, under which it is unnecessary for the producer even to be present for the hearing.

producer rates. Gulf also knew or should have known that if anything delayed the processing of its application it would likewise delay the issuance of a certificate to American Louisiana. Notwithstanding this knowledge, Gulf persisted in pressing for an affirmative approval of the initial price set forth in the contract. It is, therefore, a logical inference that Gulf inserted the price condition in its certificate application and would not recede from this position because it knew that the inclusion of a request for an affirmative finding with respect to the initial price would tend to delay the certificate proceedings beyond six months from the filing of the certificates and thus enable Gulf, if it appeared to its advantage, to assert its rights to cancel the contract under Article V, Sec. 6. That the purpose of Gulf for including the controversial provision in its application was for the purpose of delay becomes even more evident when events subsequent to the veto of the Harris Bill (H. R. 6645) are considered. Gulf at all times viewed with apprehension the possibility that producers of gas would become subject to regulation by the Commission. Article XX of the 1953 contract between Gulf and American Louisiana gave Gulf the right to cancel the contract if any federal regulatory body took any formal action to exercise or extend its jurisdiction to declare Gulf a natural gas company or to regulate its prices. After the Supreme Court held in the Phillips-Petroleum case that the Natural Gas Act covers sales by producers to interstate pipe-line companies, Gulf cancelled its 1953 contract with American Louisiana and based its right to terminate, in part, on Article XX. During negotiations leading to execution of the 1955 contract the Harris Bill which provided, in part, that the Commission would not have the authority to revise the initial rates agreed upon by producers and pipe-line companies under contracts entered into prior to the date of its enactment was before Congress. The natural gas industry expected the Harris Bill to be enacted into law. Congress passed the bill but the President vetoed it on February 17, 1956. Immediately after the veto, Gulf's general counsel called a conference of company attorneys and management personnel to consider the termination provisions of its contracts with American Louisiana. A memorandum was prepared by the Gulf legal department analyzing these provisions. The memorandum pointed out that the Commission had previously issued unconditional certificates to four other producers who were then selling gas to American Louisiana and recognized that if Gulf filed a routine application the Commission would probably not attach unsatisfactory conditions for it would be "logical for the Commission to grant Gulf the same type of certificate granted to the four producers referred to above * * *". The memorandum also stated that:

"Before drafting the application for certificates and before formulating our strategy before the Commission we should know whether management would elect to exercise its right to terminate should it arise because if we ultimately make deliveries to American Louisiana there will be a material advantage in avoiding, if possible, a conditional certificate reducing the initial price we are to receive".[7]

An officer of American Louisiana testified that he talked on numerous occasions with members of the Commission in an attempt to secure an early hearing date but that every time he approached them on the subject "they brought up the question of the price condition" that Gulf inserted. American Louisiana was also told by a member of the Commission staff that if the Commission did consider making the finding requested by Gulf

---

7. The remainder of the memorandum indicated that the writer would undertake to explore the possible uses to which the gas would be put—uses not subject to control by the Commission—in the event the contracts were cancelled.

"it would mean a great delay possibly for a year".[8]

 American Louisiana in good faith attempted to secure the approval necessary to carry out its contract. Gulf was obligated to refrain from preventing American Louisiana from obtaining the approval it was required to secure. It is elementary that insistence upon strict compliance with cancellation provisions of a contract carries with it the obligation upon the party asserting such right to do nothing to create the conditions that permit the exercise of the right. In his Treatise On Contract, Sec. 1266 (1951) Professor Corbin writes:

"A power may be reserved to one party to terminate the contract if the other party fails to render specified performances or to produce certain results. Here, the failure of the other party is a condition precedent to the existence of the power. If the performance or results so specified can not be brought about without the co-operation of the first party, a promise to co-operate will usually be implied on his part. He will be deprived of the power to terminate if he is himself a wrongful cause of the other's failure to perform or to produce the results. His power to terminate will be held to be constructively conditional on his own co-operation. His failure to co-operate is wrongful; and he can not take advantage of his own wrong".

The record here is replete with evidence which indicates that Gulf deliberately filed an application which it knew or should have known was likely to delay the issuance of the certificates and which, in fact, did delay them.

There remains to be considered Gulf's final contention that any delay by the Commission in acting on the applications filed by Gulf and American Louisiana was caused not by the insertion of the price condition in its application but by the intervention of Panhandle Eastern Pipe Line Company in these certificate proceedings. Panhandle did not petition to intervene until September 10, 1956. The petition was granted on October 14, 1956. While the intervention of Panhandle may undoubtedly have delayed the hearings during the latter part of the sixth month period the intervention of Panhandle does not in any way account for any delay from May 14, 1956, to the date of intervention, nor does it in any way indicate that the delay after September 10, 1956, must be attributed solely to the intervention of Panhandle.

A judgment in accordance with the prayer of the plaintiff may be presented for signature.

APPENDIX

ARTICLE V

Initial Delivery and Term

"1. Buyer will commence and proceed with reasonable diligence to construct that portion of its proposed interstate natural gas transmission line extending to the Krotz Springs Field as soon as practicable after counsel for Seller gives Buyer an opinion stating either (a) that Seller has obtained and has properly accepted a valid Certificate of Public Convenience and Necessity from the Federal Power Commission authorizing Seller to make the deliveries of gas contemplated hereby and that the order granting said certificate is no longer subject to judicial review or, if judicial review proceedings are pending, that such review is frivolous or that success

8. The statements made by the members of the Commission and its staff are hearsay. However, this testimony was not objected to and therefore it may be considered and given whatever probative effect it may have. Spiller v. Atchison, T. & S. F. R. Co., 253 U.S. 117, 40 S. Ct. 466, 64 L.Ed. 810; Rowland v. Boyle (St. Louis & S. F. R. R. Co.), 244 U.S. 106, 37 S.Ct. 577, 61 L.Ed. 1022; Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500; Petro v. United States, 6 Cir., 210 F.2d 49. In addition counsel for both parties during oral argument stated that such statements might be considered by the court.

on review by the party or parties seeking such review will not materially adversely affect the right or ability of Seller to make the deliveries of gas contemplated hereby, or (b) that no such authorization is required from the Federal Power Commission or any other regulatory body to permit Seller to make the deliveries of gas contemplated hereby.

"Upon completion of the construction referred to in the preceding paragraph of this Section 1, the delivery and purchase of gas hereunder shall commence, provided, however, that such date of delivery and purchase shall not be later than six months after the opinion referred to in the next preceding paragraph has been given by Seller to Buyer.

"Should Buyer not commence to take delivery of gas in the quantities hereunder provided when required to do so by the preceding paragraph of this Section 1, Buyer shall nevertheless thereafter pay Seller for the quantity of gas which it is obligated hereunder to take until such deliveries are actually commenced. Any such payments in advance of actual deliveries shall be made each month, accompanied with statements, at the time and for the prices provided for as if the gas were actually delivered. Buyer shall have the right to receive, without additional cost, any additional gas so paid for prior to the time of actual deliveries but not actually received at any time during the first three accounting years following the accounting year in which actual deliveries commence; provided that such volumes shall be over and above the minimum volumes which Buyer is obligated to purchase hereunder and shall not be in excess of a quantity equal to the difference between such minimum volumes and the maximum amount of gas which Seller is obligated to have available for delivery hereunder.

"2. Unless terminated as herein provided, this Agreement shall remain effective as long as Seller's interest in the gas produced hereunder shall be produced in paying quantities or until the amount of gas available to Buyer shall be so reduced that further operation of its pipe line shall in Buyer's judgment no longer be profitable to Buyer and such operation shall be discontinued.

"3. Seller agrees to file with the Federal Power Commission and to prosecute with due diligence an application for a Certificate of Public Convenience and Necessity authorizing Seller to initiate and carry on the sale of gas contemplated herein. It is agreed, however, that, unless such a certificate is no longer legally required, this agreement may be terminated by Seller upon written notice given by Seller to Buyer in the event the Federal Power Commission issues Seller a Certificate of Public Convenience and Necessity containing conditions which are unsatisfactory to Seller.

"4. In case the Certificate of Public Convenience and Necessity referred to in Section 3 of this Article is still legally required to be obtained and accepted by Seller and Seller shall not have validly accepted such a certificate within the time specified for acceptance by the Federal Power Commission, Buyer may at any time thereafter terminate this contract by giving written notice to Seller.

"5. Buyer agrees to file with the Federal Power Commission and to prosecute with due diligence an application for such authority as may be necessary to enable it to expand the certificated capacity of its line to accept and transport the quantities of gas to be purchased hereunder, and the obligations of the Seller and the Buyer hereunder are conditioned upon the obtaining of such authority.

"6. If either party shall fail to obtain requisite authority from the Federal Power Commission within six months after making application therefor, the other party may cancel this contract."