**WESTERN NATURAL GAS COMPANY, a Dissolved Delaware Corporation, and Henry O. Weaver, Trustee in Dissolution of Western Natural Gas Company, Appellees,**

v.

**CITIES SERVICE GAS COMPANY, Appellant.**

**No. 43624.**

Supreme Court of Oklahoma.

May 9, 1972.

Appeal Dismissed and Certiorari Denied Dec. 11, 1972. See 93 S.Ct. 559.

Rehearing Denied July 18, 1972.

V. P. Crowe, L. E. Stringer, Clyde A. Muchmore, of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, John C. Dawson, Houston, Tex., for appellees.

Jack W. Wertz, Daniel R. Hopkins, Joseph H. Crosby, Coleman Hayes, Harvey L. Harmon, Oklahoma City, for appellants; Monnet, Hayes, Bullis, Grubb & Thompson, Franklin, Harmon & Satterfield, Oklahoma City, of counsel.

Gordon Gooch, Gen. Counsel, Peter H. Schiff, Sol., Robert C. McDiarmid, Asst. Gen. Counsel, Washington, D.C., for the Federal Power Comm., amicus curiae.

DAVISON, Vice Chief Justice.

This appeal by Cities Service Gas Company (Cities) seeks reversal of a judgment based upon a jury verdict against Cities in favor of Western Natural Gas Company, a dissolved Delaware Corporation, and Henry O. Weaver, Trustee in dissolution of Western Natural Gas Company (Western) in the sum of $5,026,626 with interest thereon at 10% per annum from May 8, 1969, until paid. Cities also ask that we render judgment in its favor and against Western. The action was instituted on November 28, 1966, in the District Court of Oklahoma County by Western against Cities in which Western claimed that Cities had breached implied obligations in a contract covering the sale of natural gas from Western to Cities resulting in damages to Western.

As we relate the story of this litigation in relevant parts, in addition to references made to Cities and Western, references by the indicated symbols may be made to El Paso Natural Gas Company (El Paso), the Federal Power Commission (FPC), Southern California Gas Company and Southern Counties Gas Company of California (California Companies), Sinclair Oil and Gas Company (Sinclair), Pan American Petroleum Corporation (Pan American), Kansas Power and Light Company (KPL), Transwestern Pipe Line Company (Transwestern), and Cities Service Helex, Inc. (Helex).

Western's petition, as amended, after identifying the parties and the nature of their operations, allege Western's acquisition of oil and gas leasehold estates covering 35,000 acres of land in Grant and Stanton Counties, Kansas, in the Kansas-Hugeton Field and the production and marketing therefrom of the natural gas at 8¢ per mcf under a contract dated September 29, 1949, between Western as seller and Cities as buyer for a term of 10 years from April 1, 1950, the date of the first delivery of gas thereunder.

The petition as amended states the following additional facts: The Contract of September 29, 1949, was subject to an antecedently executed contract dated May 1, 1947, between Western, as seller, and El

Paso as buyer, whereunder El Paso acquired the preferential right, exercisable at any time within thirty years from May 1, 1947, to purchase gas which might be produced from Western's Oil and Gas Leasehold estates. At the time the Contract of September 29, 1949, was entered into Western, Cities and El Paso made an agreement whereby El Paso agreed to forego its preferential right to purchase gas during the term of the (1949) Contract.

The petition as amended alleged additionally that by reason of the execution of the contracts hereinabove mentioned, Cities had a continuing express and implied contractual obligation to Western to carry out the termination provisions of said contracts and to convey to Western or its order the gathering lines and facilities on the expiration of the contract and such obligations on the part of Cities Service included the obligation to cooperate with Western in the obtaining of any necessary governmental authority required in order for it to obtain such release of such gas and the conveyance and delivery to it or its order of such gathering lines and facilities.

The petition as amended also alleged that on February 16, 1959, El Paso notified Western of the exercise of its preferential right under the contract of May 1, 1947, to take Western's gas then being sold to Cities under the Contract of September 29, 1949, which, subject to the jurisdiction of the Federal Power Commission, terminated April 1, 1960; that on May 29, 1959, Western filed an application before FPC to abandon service to Cities under the Contract of September 29, 1949, and on June 26, 1962, Western amended its application to make reference to a more favorable contract as to price Western had made with El Paso on January 30, 1962; that Cities had a continuing implied obligation under the Contract of September 29, 1949, to cooperate with Western in its efforts to obtain release of its gas and to comply with and enjoy the benefits of the prior agreement of May 1, 1947; that Cities was thereby obligated to cooperate in the re-

quired abandonment proceeding before FPC in the full and fair presentation of the facts, which Cities failed and refused to do. Cities failed and refused to cooperate with the lawful assertion of rights of Western in said proceeding and in violation of its obligations to Western it intervened in Western's abandonment proceedings and presented objections to Western's abandonment of service to it, after the term of the Contract of September 29, 1949, had expired, without a substantial basis in fact and contrary to the facts, said acts being done for the private corporate purposes of Cities and in bad faith; that due to the bad faith conduct of Cities, Western abandoned its application to discontinue service to Cities due to the delay caused by Cities with the result that the market arranged for in the contract of January 30, 1962, between Western and El Paso was lost.

On the basis of the foregoing allegations Western alleged resulting damages in value to its natural gas reserves in the sum of $7,397,772.

Cities' general demurrer to Western's petition, as amended, was overruled by the trial court.

In reference to issues relevant to this appeal, defendants' first amended answer denied the existence of any express or implied contractual obligations, alleged to have existed by virtue of the Contract of September 29, 1949, to cooperate with Western in any proceedings before the FPC but if any such obligations had contractually existed the same would be void, invalid and unenforceable as against public policy. The amended answer further denied that Western had any "rights" or favorable opportunity for Western to obtain an FPC order abandonment of service to Cities; that such abandonment was not in the public interest; that Cities caused no delay in FPC proceedings respecting Western abandonment application and any delay was caused solely by acts of Western.

Cities denied that it acted in bad faith and for its own corporate purpose in con-

nection with Western's abandonment application before FPC and asserts that Western acted in bad faith by failure to negotiate with Cities for the renewal or extension of its contract with Cities and by its entering into private arrangements with its corporate affiliate which were not in the public interest. Cities says further that when Western in 1954 applied for and received under the Natural Gas Act a certificate of public convenience and necessity for the continued service to Cities, Western lost its right to maintain this action.

Cities alleges additionally in its first amended answer that all its contacts with the FPC are privileged; that Western's cause of action is barred by the three year limitations, Sections 12–301(7) of the District of Columbia Code, made applicable by Oklahoma's "borrowing statute" 12 O.S. 1961, §§ 104–108 (Supp.1965) and if Western's cause of action accrued in the State of Kansas such cause of action, having accrued prior to the alleged expiration of the Contract, April 1, 1960, was barred by the Kansas 5 year limitation statute, K.S.A. 60–510, 60–511, applicable to any "action upon agreement, contract or promise in writing" or if the obligation is implied in the written contract the Kansas 3 year Statute of Limitation applies, K.S.A. 60–512(1) or the 3 year Oklahoma limitation statute may apply, 12 O.S.1961, § 95. This last "limitation" defense was abandoned by Cities. Cities also pleads the Oklahoma 5 year limitation statute as a bar, 12 O.S. 1961, § 95, First.

The reply of Western did not change the issues as they were made by Western's petition as amended and Cities amended answer.

As a basis for the solution of the questions presented by this appeal we deem it necessary to advert to certain conclusions of law or fact or law and fact concerning which both parties, Western and Cities agree, but with which we disagree.

Western, in paragraph 8 of its petition as amended, says in effect and Cities, in paragraph 3 of its first amended answer,

"admits" that the Contract expired April 1, 1960. Cities says in its brief "The Western-Cities 1949 Contract terminated April 1, 1960 * * *." On page 26 of Western's answer brief, Western says: "Western's position in the court below, and here, is that Cities' contract right to purchase Western's gas terminated April 1, 1960 * * *." FPC in its amicus brief studiously avoids saying that the 1949 Contract terminated April 1, 1960, but rather on page 3 of its brief, FPC says, in referring to the 1949 Contract, "As a rate schedule for a jurisdictional sale of the gas, the contract in question created quite different rights and obligations than it had done as a supposedly private contract. If it had been a private contract, then the parties' obligations thereunder would have come to an end on April 1, 1960, and it could have been renegotiated at any time."

The views there expressed by FPC, as we understand them, comport with Oklahoma law. We have held: "that the existing applicable law is a part of every contract, the same as if expressly referred to or incorporated in its terms." East Central Elec. Coop. v. Public Service Co., Okl., 469 P.2d 662. Earlier we have applied that principal in holding that 52 O.S.1961, § 87.-1, became a part of an oil and gas lease contract so that a lessee's drilling of a gas well located upon lands other than the leased premises but upon the same well spacing unit, created by the Corporation Commission under the authority of § 87.1, constituted the drilling of a well on every separate lease in the unit so as to preclude the necessity of paying delay rental by lessees of other leases in the unit, which payment would have been necessary otherwise, in order to prevent lease termination. Oklahoma Natural Gas Company v. Long, Okl., 406 P.2d 499. This same principal was applied to extend the term of all oil and gas leases in a well spacing unit under their "thereafter" clause upon the finding of gas in paying quantities on land covered by one of the leases in the unit. State ex rel. Commissioners v. Carter Oil Company of West Virginia, Okl., 336 P.2d 1086.

■ Accordingly we hold that the 1949 Contract did not expire upon the expiration of the 10 year term on April 1, 1960, but would extend until FPC authorized the abandonment of the sale and delivery of gas by Western to Cities, as required by Section 7(b) of the Natural Gas Act, 15 U.S.C. 717f(b). United Gas Pipeline Co. v. FPC, 87 S.Ct. 265, 385 U.S. 83, 17 L. Ed.2d 181. For reasons hereinafter explained the abandonment of the sale of gas by Western to Cities under the 1949 Contract was never authorized, and the 1949 Contract did not expire on April 1, 1960. Deliveries of natural gas continued thereafter under the applicable provisions of the 1949 Contract, as modified by the Natural Gas Act.

■ We shall consider first Cities' contention that the cause of action stated by Western in its petition as amended is barred by the applicable statute of limitations. This contention calls for a determination of what legally permissible cause of action was stated by Western. Its stated cause of action was grounded upon the obligation or obligations implied in every contract that neither party thereto shall do anything which will destroy or injure the other party's right to receive the fruits of the contract. Wright v. Fidelity & Deposit Co. of Maryland, 176 Okl. 274, 54 P.2d 1084, 1087. This rule was applied to impute liability to Gulf Oil Corporation for exercising bad faith by including in its application to FPC for a certificate of public convenience and necessity, a condition that FPC finds that the contract prices for the sale of gas by Gulf to American Louisiana Pipe Line Company are fair, just and reasonable. Gulf Oil Corporation v. American Louisiana Pipe Line Co., C.A. 6th, 282 F.2d 401, at 404. This condition inserted in Gulf's application in bad faith, burdened a conventional certificate hearing with a complex rate hearing. Under the gas sales contract involved in Gulf each party was required under the Natural Gas Act to procure from FPC a certificate of public convenience and necessity. The procurement of American's certificate was necessary for the expansion of its pipeline capacity to receive Gulf's gas but was not necessary if a certificate was not issued to Gulf. Gulf had the contract right to cancel if American did not receive its certificate within 6 months after making application therefor. During antecedent contract negotiations between Gulf and American, Gulf attempted unsuccessfully to have such a provision included in the contract. Due to the delay caused by the insertion of the above conditions in Gulf's application, the issuance of certificate was delayed which American did not receive within the required 6 months period. Gulf canceled. In a declaratory judgment action the court of appeals affirmed the judgment of the district court (180 F.Supp. 155) denying Gulf's right to cancel. · The Court of Appeals said: "Certainly Gulf may not rely on the delay which it brought about by its own conduct to justify its cancellation of the contract. *It was obligated to do nothing which would hinder, delay or prevent the granting of its certificate within the time provided by the contract."* (emphasis supplied) And see 17A C.J.S. Contracts § 328, pp. 284–286, supported by notes 40.5 and 41. Moreover the regulatory system of the Natural Gas Act is built upon private contracts, as modified by the Natural Gas Act. United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373.

Having concluded and held that the Natural Gas Act has operated to modify the terminal provisions of the Contract of 1949 by requiring that Western's service to Cities continue under the Contract of 1949 until abandonment is authorized by FPC, we must construe Western's petition as amended to be limited to the statement of a cause of action that charges Cities with a violation of the implied contract to cooperate by its failure and refusal to make in good faith, a full and fair disclosure to the FPC of all facts relevant to FPC's determination as to whether the granting of Western's application for abandonment of service to Cities under the Contract of

1949 is or is not in the public interest. In so doing, Cities must not present objections without a substantial basis in fact and contrary to facts and in bad faith for the private corporate purposes of Cities. The alleged duty to cooperate in actions before public agencies requiring a presentation of facts necessarily means always and only that the party under the obligation has the duty to make in good faith a fair and full disclosure of the facts. Kurz v. Collins, 6 Wis.2d 538, 95 N.W.2d 365. In Kurz, the insured, in an automobile liability insurance policy, had the contractual duty to "co-operate with the company * * * and shall assist in * * * giving evidence * * *." The Supreme Court of Wisconsin in stating the requirements of this duty to cooperate said: "This court has held that co-operation on the part of an insured, under a policy condition reading as does the one here before us, requires 'a fair, frank, and truthful disclosure of information.'" See also Farm Bureau Mut. Automobile Ins. Co. v. Garlitz, 180 Md. 615, 26 A.2d 388.

■■ On the basis of the foregoing a cause of action is stated by Western against Cities that is not barred by the Oklahoma 5 year statute of limitation 12 O.S.1961, § 95 (First). Western's petition was filed November 28, 1966. Acts constituting Cities' alleged bad faith in failing to cooperate with Western in making a full and fair disclosure of relevant facts to the FPC are alleged in Western's petition as amended to have occurred within 5 years prior to November 28, 1966. This is so because the continuing duty of Cities to make a full and fair disclosure was violated allegedly from day to day by the constant assertion of facts alleged under oath in its petition in intervention. Western alleges additionally that in violation of Cities continuing covenant to make in good faith a full and fair disclosure of the facts, Cities continued its objections before the FPC in October, November and December of 1962, which objections were presented without a substantial basis in fact. "The right of action for breach of a continuing covenant accrues from day to day as long as the breach continues." Bowman v. Oklahoma Natural Gas Company, Okl., 385 P.2d 440; Indian Territory Illuminating Oil Co. v. Rosamond, 190 Okl. 46, 120 P.2d 349. Cities could have forestalled the devastating delays caused by its unlawful assertions by disclosing to the FPC at any time in the public interest that Cities did not need Western's gas. Instead there was a continuing violation by Cities of its continuing covenant. We have held that as a general rule the forum's statute of limitations apply. Shaw v. Dickinson, 65 Okl. 186, 164 P. 1150.

■ But Cities says that the law of the forum cannot apply because of our Foreign Claims Act, 12 O.S.1961, § 104–108 (Supp. 1965) commonly referred to as a "borrowing statute." Section 1 defines "claim" as "any right of action which may be asserted in a civil action or proceeding * * *." Section 2 provides: "The period of limitation applicable to a claim accruing outside of this state shall be that prescribed either by the law of the place where the claim accrued or by the law of this state, whichever first bars the claim." Cities says further that as plead and proved by Western its "claim" accrued in the District of Columbia more than 3 years prior to November 28, 1966. In response Western urges that since Cities does not transact business in The District, is not present there and cannot be sued there, Western's right of action cannot be asserted there. In fact, Western says that a cause of action cannot be said to accrue in The District because The District's courts have no jurisdiction over Cities. Cities may not be summoned there. Bruner v. Martin, 76 Kan. 862, 93 P. 165; Hays Land & Inv. Co. v. Bassett, 85 Kan. 48, 116 P. 475; Green v. Kensinger, 199 Kan. 220, 429 P.2d 95. See also Hewitt v. Biege, 183 Kan. 352, 327 P.2d 872. There can be no doubt that in applying the Kansas "borrowing statute," the Kansas Supreme Court has held that the limitation laws of another state, otherwise applicable, cannot be said to apply if the defendant cannot be summoned there and

they do apply if defendant can be summoned there. We have never passed upon this precise question. We conclude that Kansas and other states, adhering to this same rule, have reached a sound result. We see no reason to conclude that the Oklahoma Legislature in enacting Chapter 98, Laws of 1965, intended to borrow the limitation law of a jurisdiction in which the defendant cannot be summoned.

We are not persuaded by Cities that in adhering to Bruner and others we are thoughtlessly applying the tolling provisions of the applicable statutes. As Cities points out on page 44 of their brief Section 12,303 of the District's Code applies only to absconded or concealed residents. Moreover 12 O.S.1961, § 98, is written upon the assumption that a litigant named as a defendant may be summoned in Oklahoma. In fact in Bruner, the Kansas Supreme Court, in deciding that the Kansas borrowing statute did not embrace the limitation laws of a state where the defendant could not be summoned, had the Kansas tolling statute before it. Indeed in Bruner, the Kansas Supreme Court considered and rejected the argument that the Kansas tolling provisions applied in Bruner.

 Cities argues also that an obligation express or implied to "cooperate" is invalid and unenforceable as contrary to public policy. This argument is advanced by Cities upon the assumption that Western's petition as amended and its proof alleges and attempts to establish only an obligation upon Cities to cooperate with Western in accomplishing Western's private corporate purpose to discontinue service to Cities in a way that is contrary to the public interest. We have held that Cities had no such obligation, that Cities' only obligation is to make a full and fair disclosure of facts relevant to FPC's determination of where the public interest lies and in so doing Cities must not present objections without a substantial basis in fact, and contrary to facts and in bad faith for the private corporate purposes of Cities. We have given Western's petition as amended this construction. Given this construction

to Western's petition as amended a cause of action is stated because the implied obligation thus embraced does not violate public policy.

Certainly, on the basis of the foregoing, Cities had the right to intervene in Western's abandonment of service proceedings for the purpose of making a full and fair disclosure of facts relevant to FPC's determination of where the public interest lies, but in its petition in intervention Cities did not have the right to present objections without a substantial basis in fact and contrary to the facts and in bad faith for the private corporate purposes of Cities. This does not mean that Cities could not plead that in the public interest Western's amended application to abandon service to Cities should be denied provided Cities' conduct met the standards indicated above.

We are aware that in Gulf, supra, the Court of Appeals for the Sixth Circuit said in a certificate case before FPC "It [Gulf] was obligated to do nothing which would hinder, delay or prevent the granting of its certificate within the time provided by the contract." In Gulf there was no controversy between Gulf and American as to where the public interest lay. Each was seeking a certificate in the accomplishment of a common contractual purpose.

 Citing Whitmire v. Zolbe, Okl., 403 P.2d 445, 448, Cities next contends that Western waived its right to assert a contract violation against Cities because Western did not make this assertion in opposition to Cities' petition in intervention. Whitmire is not applicable for the reason that in Whitmire there was a failure to assert a right in a proceeding pending in a tribunal which had jurisdiction to determine the issue. Here the FPC could not take remedial cognizance over Cities' contract violation.

 We do not agree with Cities' contention that the trial court's judgment is an invasion of the exclusive jurisdiction of the FPC. In its amicus brief, FPC agrees that redress for an abuse of FPC process by bad faith conduct is a matter for judi-

cial decision, pointing out nevertheless, that Western has misconceived the nature of its case against Cities which FPC says should have been stated in tort for abuse of FPC process and not for violation of an implied contract obligation. The implied contract obligation to make full and fair disclosure of all relevant facts in good faith involves, obviously, an obligation upon Cities not to abuse FPC process. In this connection, FPC does say that the issue of bad faith should be referred for determination to FPC; that FPC is more expert in determining bad faith than a court and jury and that judicial proceedings should be held in abeyance and be governed by FPC's finding on this single issue. FPC adds that this issue is very closely related to its duties. But the judiciary has been dealing with the issue of bad faith for centuries. Issues involving contract violation were not made subject to the cognizance of FPC by the enactment of the Natural Gas Act. Pan American Petroleum Corporation v. Superior Court, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584; Gulf, supra. Additionally Western claims with evidential support that the record reveals that proof of bad faith involves evidence of events outside FPC hearings.

We next consider Cities argument that its actions before the FPC were privileged. This argument requires an extended review of the record. Cities offered no testimony at any of the hearings on Western's original or amended application for abandonment but Cities did file, upon leave, a petition in intervention (P.Ex. 23) and its counsel made statements at such hearings comporting with Cities' petition in intervention and examined Western's witnesses. Upon advice from FPC in response to Cities' letter (P.Ex. 40) of August 7, 1960, Cities was not required to and did not file another application to intervene upon the filing on June 26, 1962, of Western's amended application to abandon service.

In Cities' original application to intervene in the consolidated cases before FPC (G–18661 for Western's abandonment of its service to Cities and G–18662 for a certifi-

cate for Western to sell gas to El Paso), Cities alleged, inter alia (1) Cities will be adversely affected if Western is permitted to abandon service to Cities; (2) Cities will be required to purchase gas from presently unconnected sources equivalent volumes of gas to meet the estimated demands of its customers; (3) Cities' paramount right to buy gas produced by Western's tenants-in-common through Western's wells will be defeated by Western's exercise of its contract right to purchase Cities' gathering lines unless Cities incurs the great expense of building additional gathering lines; (4) Cities has a greater need for gas produced by Western than El Paso to whom Western would sell the gas upon abandonment of its services to Cities; (5) the diversion of the gas supply from Cities' consumers of the Kansas, Missouri Market to El Paso's California consumers would require the expenditure of substantial sums which cannot be said to serve the public interest.

Ostensibly to counter some of the reasons stated in Cities' Petition in Intervention, why Western should not abandon service to Cities, Western made new contractual arrangements with El Paso and El Paso with Pan American and Pan American with KPL so that Western's gas would not go to California companies via El Paso but would be consumed in KPL's Kansas markets.

Cities' verified petition in intervention was filed with the FPC on February 26, 1960, and later made applicable to Western's amended abandonment application filed June 26, 1962. (P.Ex. 41)

Prior to the filing of Cities' petition in intervention Mr. Russell V. Hoffsess, a Vice President of Cities, who was responsible for the administration of the 1949 Contract, had written a memorandum to Mr. G. C. Roth (P.Ex. 15) another Cities Vice President telling him that Henry O. Weaver, a Vice President of Western, had notified him that El Paso had demanded deliveries by Western of its gas to El Paso upon the expiration on April 1, 1960, of

the 10 year term of the 1949 Contract. After stressing to Roth that Western's reserves of 237 billion cubic feet of gas is quite an attractive package of gas, Hoffsess wrote this:

"It does not appear at this time that in light of El Paso's prior claim to this gas and their offer of 21¢ for it at Dumas that it would be possible for us to extend the contract. It is my belief that Mr. Weaver was notifying us in good faith of their intention to disconnect it from us and deliver it to El Paso in the event they are able to get Federal Power approval. *It appears to me that our only chance to retain this gas is to object to their discontinuance of service to us and obtain a Federal Power Commission order requiring that it be left connected to our system.* We are at somewhat of a disadvantage in making our position with the Commission at this time since we have considerable accumulated underproduction in the Kansas-Hugeton Field due partly to our being connected to more gas per demand on the field than the average of other companies in the field.

"I am furnishing the Legal Department with a copy of this memorandum and I recommend we make preparation to oppose Western Natural's application when it is filed;" (P.Ex. 15) (Emphasis supplied)

Descriptive of the nature of Cities' desire and efforts to retain control of Western's Kansas-Hugeton reserves is the following excerpt of Hoffsess testimony on cross-examination:

"Q. Did Western Natural Gas Company in June, 1962, file an amended Application seeking an Order from the Federal Power Commission authorizing abandonment of such sales to Cities Service?

"A. I believe they did.

"Q. Did Cities Service Gas Company oppose Western's 1962 Amended Application before the FPC to discontinue those sales to Cities Service?

"A. Yes, sir.

"Q. And did you continue to oppose it until it was withdrawn in December, 1962?

"A. Yes, sir.

"Q. And you had your lawyer Littman there opposing it, did you not?

"A. Yes, sir.

"Q. Were you there?

"A. Yes, sir.

"Q. Giving it whatever support you could?

"A. Yes, sir.

"Q. You did everything you could do to keep Western from getting those reserves loose, did you not Mr. Hofsess?

"A. I don't know.

"Q. Well, can you think of anything now that you could have done that you didn't do to oppose it?

"A. I don't know.

"Q. Can you think of anything?

"A. I don't know whether I could or not". (T.XV, 70–71)

On September 8, 1958, Cities made its application to sell 50 million cubic feet of gas per day to Transwestern Pipe Line Company at 21¢ per M.C.F. In this application Cities emphasized (1) the need to sell the gas to exhaust Cities allowable production else such production will be lost to Cities and its customers; (2) the proposed sale will not impair service to any existing firm customers of applicants; (3) Cities has had difficulty in finding a market for all the gas it is allowed to produce; (4) Cities has available undeveloped reserves in deep reservoirs in the Kansas-Hugeton field which it estimates to contain 304.8 billion cubic feet.

On September 27, 1961, Cities filed its application with FPC for a certificate to sell 75 million cubic feet per day for the production of helium to its affiliate Cities Service Helex, Inc. Prior thereto on June 28, 1962, the officers of Cities met to explore Cities' supply situation and the expansion of its intra state market (Kansas)

through sales of its affiliate Kansas Gas Supply Corporation who had in mind a sale to KPL who was then under a contract to purchase Western's gas from Pan American provided Western could secure from FPC authority to abandon services to Cities in time to make deliveries to Pan American through El Paso on or before January 1, 1963.

After 1957 Cities did not purchase for several years the allowable production from wells to which it was connected in the Kansas-Hugeton field. By 1968 Cities' underproduction stood at 313.8 billion cubic feet, which exceeded by 76 billion cubic feet Cities' estimate of Western's entire reserves.

During this period Cities' lawyer was representing to the FPC under oath by verification of its petition in intervention in Western's abandonment of service proceedings, that if Western was permitted to abandon its gas sales to Western, "Cities would be required to purchase from presently unconnected sources equivalent volume of gas in order to meet the estimated demands of [Cities] * * * existing customers." This allegation was made at a time that Cities was attempting to sell gas to KPL whose source of supply under contract was Western's gas via Pan American provided FPC granted Western's application for abandonment of service to Cities on or before January 1, 1963. Faced with the inability to procure FPC approval of application to abandon service to Cities in time to meet its delivery obligation on January 1, 1963, Western abandoned its application to discontinue service to Cities on December 18, 1962.

Cities, on the basis of the foregoing, urges that its actions are protected by an absolute privilege "irrespective of the truth of such statements or bad faith in making them."

As initial support for its argument on "privilege" Cities says:

"12 O.S. 1443 defines privileged communications:

A privileged publication or communication is one made:

First: In any legislature or judicial proceeding or any other proceeding by law;
* * *"

But Cities does not articulate the contextual setting of the statutory provisions. Section 1443 is part of Chapter 25 of our Code of Civil Procedure (12 O.S. 1961, §§ 1441 to 1447.5) defining libel and slander, conditioning the nature of the liability for defamation, the requirements for pleading and proof, and protecting persons from liability for having made otherwise actionable defamatory statements in legislative, judicial or any other proceeding authorized by law. The Oklahoma cases cited by Cities involve only issues in defamation. Pacific Employers Ins. Co. et al. v. Adams, 196 Okl. 597, 168 P.2d 105; Hughes v. Bizzell, 189 Okl. 472, 117 P.2d 763. And see Rainer's Dairies v. Raritan Valley Farms, 19 N.J. 552, 117 A.2d 889, cited by Cities in support of its position that "privilege is not limited to cases where the cause of action is libel and slander." But Rainer was treated by the Supreme Court of New Jersey as involving a complaint against the defendants for uttering defamatory statements for the purpose of determining whether "privilege" could be invoked as a defense.

■ Western's cause of action against Cities is not grounded upon libel or slander and for damages caused thereby nor for damages resulting from perjured testimony but is for violation of the implied contract obligation to make a fair and full disclosure of the facts relevant to FPC's determination of where the public interest lies and for having committed this violation in part by presenting objections without a substantial basis in fact and contrary to facts for the single purpose of serving the private corporate purposes of Cities. "* * * in every contract there exists an implied covenant of good faith and fair dealings, and, more specifically, under such rule, the law will imply an agreement to refrain from doing anything which will

destroy or injure the other party's right to receive the fruits of the contract." 17A C.J.S. Contracts § 328, pp. 284–286. Here the issue is whether the conduct of Cities, commencing with Hoffsess' realistic observation to his colleagues in Cities that Western's reserves constituted an attractive package of gas and the only way to hold on to the package was by resisting Western's application to abandon service to Cities, violated this implied obligation, followed as it was by instructions to their lawyers to intervene and by their intervention without making a full and fair disclosure of the facts. To apply the doctrine of privileged communications here as Cities seeks to apply it makes a shamble out of any effort by the FPC to determine where the public interest lies. The parties would be all too free to negate the public interest. We reject the application of "privilege" here.

Assuming that Cities' conduct resulted in such a delay that Western's efforts to free its gas for a more lucrative market was frustrated by Cities, the question then arises: Did Cities' conduct cause damage to Western?

On this issue Cities make four points:

"1. Federal Power Commission authorization of the Western abandonment prior to January 1, 1963, would not have satisfied the contractual requirement that Federal Power Commission certificates be issued to Pan American Petroleum Corporation for sale of gas to El Paso prior to such date;

"2. No proof was offered that loss of the El Paso-Pan American-Kansas Power and Light Company market resulted in any damage to Western;

"3. Western's effort to prove damage flowing from loss of the El Paso-Pan American-Kansas Power and Light Company market was predicated on an improper and erroneous theory in that it was based upon contractual disposition of the gas not contemplated by the parties

when the Western-Cities contract was made and

"4. Western was required to utilize the damage theory which would result in the lowest damage estimate."

In response Western says that the proper measure of damages is the difference between the market value of Western's Kansas-Hugeton gas reserves assuming Western's continued deliveries to Cities and their market value on January 1, 1963, if disconnected from Cities on that date, and delivered to KPL via Pan American based in part upon the contractual arrangement of January 30, 1962, between Western and El Paso and implemented by the contracts between El Paso and Pan American. Western's experts on valuation used the method employed by all valuation engineers including Cities' experts for determining the amount of reserves owned by Western in both the Chase reservoir and the underlying Council Grove reservoir. This method is generally referred to as the "pressure decline method." It calls for the application of Boyles Law, which is that the volume of gas varies inversely with the pressure. The decline in reservoir pressures and the volume of gas taken from the reservoir over the period of decline constitutes the basis for determining the volume of gas reserves remaining in the reservoir. This data is required to be filed by producers of gas with the State Commissions having control and supervision over natural gas production. What volume will be produced over the life of the contract, and at what daily or monthly rates, is involved. A price per mcf, increasing in later years according to schedule, is applied to this volume to determine gross income. From gross income accruing over the life of the contract there is deducted (1) the value of ⅛th royalty; (2) expenses for operating the property; (3) excise and property taxes. This calculation produces net income over the life of the contract. Net income is then reduced to present worth by the use of a discount factor (6%). This discount factor represents the interest rate prevail-

ing at the time it is used. Finally to allow for a profit margin and income taxes the present worth amount is reduced by 33⅓%.

According to Western's valuation expert, Derrick, (P. Ex. 83) using this method for determining what value or price a willing buyer and a willing seller would arrive at, Western's gas if sold under the El Paso-Pan American-K.P.L. contractual arrangement would make Western's property worth $16,707,330 as of January 1, 1963, and worth only $9,958,420 if Western's gas is continued to be sold under the 1949 Contract with Cities, representing a difference in value of $6,748,910. On the other hand Cities valuation experts (D. Ex. 93) concluded that Western's Kansas-Hugeton gas reserves as of January 1, 1963, would be worth $5,675,627 if sales are continued to Cities Service and worth only $4,738,186 if Western's gas is sold under the Western-El Paso contract of January 30, 1962. Each expert assumed deliveries at differing rates and at different prices from January 1, 1963 to January 1, 1983. Obviously, differences in the application of price, volume, rates of withdrawal, operating expenses, unusual operating conditions and other differences explains the difference in the results of the rival experts. Derrick, Western's expert, used a price of 14½¢ per mcf for Chase gas which was the price stipulated in the El Paso Western renegotiated contract of 1962, escalating 1¢ per mcf each 5 years. On the assumption that Chase gas would continue to go to Cities, Derrick used 11¢ mcf and for Council Grove gas 16¢ per mcf, without escalation was used. Beebe, another valuation expert for Western, agreed with Derricks' valuations. Houser, a valuation expert for Western, using slightly different prices, arrived at $7,397,772 as the figure which represented the greater value of Western's reserves if produced and sold under the renegotiated contract of January 30, 1962, between Western and El Paso rather than under the contract of 1949 between Western and Cities. The jury's finding was $5,026,626.

What Cities' attack on Western's projected market values actually means is that the mathematical premises and assumed variations in operating conditions used by Western's valuation experts who testified were different than those used by Cities' experts.

For example—in valuing Western's reserves on the assumption that Western's service to Cities would be continued, Cities' experts would not assume that the 15¢ per mcf Western was collecting from Cities would be sustained as reasonable. Refund would be required if FPC did not find the 15¢ rate was fair and reasonable. Additionally Cities attacks the 14½¢ per mcf rate used by Western's expert Derrick because the rate was not contemplated by the parties at the time of the Contract of 1949 between Western and Cities was entered into. Applying C.O.S.1931, § 9963 (23 O. S.1961, § 21), we held in Eason Oil Company v. Whiteside, 175 Okl. 254, 52 P.2d 35, that damages recoverable upon breach of contract obligation are "such as might fairly and reasonably be considered from arising naturally according to the actual course of things * * * or were such as might reasonably be supposed to have been in the contemplation of both parties at the time they made the contract." Western was an independent producer of natural gas. Cities was a natural gas pipe line company who also was a producer of natural gas. The Contract provided for a term of 10 years expiring April 1, 1960. The Contract was subject to an antecedent contract between Western and El Paso executed May 1, 1947, for a term of 30 years. Contract renegotiation was and is an industry habit. A gradual increase in prices was expected. In fact Cities was desirous of renegotiating the Contract between Western and Cities executed September 29, 1949. With this background including constant competition for acquisition of gas reserves and for a market we believe the El Paso-Pan American-KPL contractual arrangements as well as the related renegotiated contract of January 30, 1962, between Western and El Paso would be

something arising naturally and well within the contemplation of Western and Cities on September 29, 1949. Moreover at that time California companies were reaching for Kansas-Hugeton gas.

Cities contends also that Western was required to utilize the damage theory which would result in the lowest damage estimate. In support Peevyhouse v. Garland Coal and Mining Company (Okl., 382 P.2d 109, 110) is cited. The claimed applicable language is: " * * * where the contract provision which was breached was merely incidental to the main purpose in view, and were the economic benefit which would result to lessor by full performance of the work is grossly disproportionate to the cost of performance, the damages which lessor may recover are limited to the diminution in value resulting to the premises because of nonperformance." In Peevyhouse, the lessee was required, upon the expiration of the coal mining lease to perform certain remedial work which was not done. To do the remedial work would have cost $29,000 with the result that the value of the premises would only be increased $300.00. We held only $300.00 could be recovered. Peevyhouse is not applicable. The efforts of Cities to defeat Western's application to abandon service to Cities, thus freeing Western's gas for a more lucrative market is more than incidental to the main purpose of the Contract.

In the face of the antecedent contract of 1947 between Western and El Paso and the 10 year "cut off" date of the 1949 contract between Western and Cities, Western's future disposition of its gas assumed paramount importance. Neither is there any basis in the record for saying that the cost to Cities for freeing Western's gas is disproportionate to the benefit that would accrue to Western. We repeat here that Cities aggregate under-production from the producing gas wells to which Cities was connected amounted to 313.8 billion cubic feet by 1968 which exceeded by 76 billion cubic feet Cities' estimate of Western's entire Kansas-Hugeton reserves. This means that with the loss of Western's gas reserves, Cities, contrary to what was alleged in its petition in intervention would not have to look elsewhere for gas. Moreover, Western's asserted position both in its petition as amended and in its proof is the measure of damages we applied in Peevy, that is, the difference in the value of Western's reserves under the renegotiated contract and under the El Paso-Pan American-KPL contractual arrangement which provided an outlet for Western's gas subject to disposition by El Paso under the renegotiated Western El-Paso contract of January 30, 1962.

We do not agree with Cities that the jury's verdict and the court's judgment is purely speculative. Cities argument on this issue is based partly upon the premise that whether any damage occurred is highly speculative and partly upon the premise that if any damage occurred "how much" is speculative. On the basis of this record, taking into account a constantly increasing demand for an exhaustable resource like natural gas, there is nothing speculative in the assertion that damage results when a producer's contractual opportunity to sell his gas at a higher price per mcf is defeated. Neither is it speculative under the demand-supply history reflected by this record that continuing increases are inevitable. Cities' enjoyment of an oversupply perforce current allowable production does not gainsay the inevitability of price increases.

There can be no doubt under the record in this case that Cities was trying to do everything it knew how to do to resist Western's application to abandon service. Neither can there be any doubt that Cities' resistance was a substantial cause factor in defeating Western's efforts to free its reserves from the Contract of 1949 by December 31, 1962. Whether, absent Cities' opposition, the amended application for abandonment of service to Cities would have been granted on or before December 31, 1962 was the important issue. This important issue was in an area of knowledge that called for the exercise of the trial court's discretion in sanctioning the admis-

sibility of expert testimony. It is only when the proffered evidence is clearly within the comprehension of a layman that the trial court's judgment in permitting expert testimony will be disturbed. Bosse v. Ideco Div. of Dresser Ind., Inc., 10 Cir., 412 F.2d 567. See also Continental Oil Co. v. Ryan, Okl., 392 P.2d 492. It does not appear that Cities disputes the trial court's judgment in permitting expert testimony on this issue by both parties. True it is that Western's expert and Cities' experts disagreed sharply. Nevertheless juries function for the purpose of resolving such conflicts.

Neither do we think that the record supports Cities' argument that the KPL market would not have been available to Western's gas even upon the assumption Western's gas would have been available for delivery prior to January 1, 1963. But the delivery of Western's gas to KLP via Pan American was entirely intrastate without interstate commingling and therefore not within the jurisdiction of the Federal Power Commission. This contemplated delivery involved contractual arrangements between Western and El Paso, between El Paso and Pan American, all dated January 30, 1962, and between Pan American and KPL dated April 18, 1960. Under the El Paso-Pan American arrangements, Pan American was to receive Western's gas via El Paso in exchange for Pan American's delivery of its San Juan basin gas to El Paso. This latter delivery required an FPC certificate. Cities points out that Cities did not intervene in Pan American's certificate hearing, therefore, Cities had nothing to do with the delay and had nothing to do with FPC's refusal to consolidate Western's abandonment proceedings with Pan American's certificate hearing. But Cities stifled the efforts of all interested parties by its continuing refusal to make a full and fair disclosure in Western's proceedings to abandon service to Cities. Cities' refusal operated to control the contractual fate of Western, El Paso, Pan American and KPL. Cities, as an institution schooled in production, transmission and sale of natural gas, acquainted with the ex-

igencies of FPC control of the interstate transmission and sale of natural gas, knew when it obstructed by misrepresentation and in bad faith, Western's effort to abandon service to Cities under the 1949 contract, that its obstructive efforts could not only defeat Western's abandonment application but would impede, if not completely defeat other necessary efforts to obtain FPC authorization and to make operating arrangements to deliver Western's gas to KPL. Cities will not be permitted to assert in its defense the delays which Cities itself has caused. Gulf Oil Corporation v. American Louisiana Pipe Line Company, supra.

We have held herein that Western's petition states a cause of action that is not barred by 12 O.S.1961, § 95, First. The proof in this case is conclusive that Cities' defense, on the ground Western's cause of action is barred, is not supported by the evidence. Cities' violation of its continuing obligation to make a full and fair disclosure to the FPC occurred as late as December 18, 1962, the day on which Western withdrew its application to abandon service to Cities under the Contract of 1949. Cities could have discontinued this violation at any time by disclosing to the FPC its continuing over supply of gas that could have been currently produced and by disclosing what it had told the FPC in its application of September 8, 1958, to sell 50 million cubic feet of gas per day to Transwestern Pipe Line Company and in its application of September 27, 1961, to sell 75 million cubic feet per day to its subsidiary, Cities Service Helex, Inc.

We next turn to the trial court's instructions to the jury. After the trial court's conventional instructions including the permissible scope of the jury's inquiry and duty, the purpose of the pleadings, a review of the pleadings and their function in defining the issues, the burden of proof and its meaning, the jury was told in instructions Nos. 7 and 8 that Cities had no contract right to require the delivery of Western's gas after April 1, 1960, but under the Natural Gas Act such deliveries

could not be discontinued except upon authorization by the FPC. Although we hold herein that this requirement of the Natural Gas Act became a part of the 1949 Contract to extend its term, the trial court in instructions Nos. 7 and 8 expressed the views held by both Western and Cities.

Instruction No. 9 clearly told the jury that Cities had the right to intervene for the purpose of presenting facts fairly and fully in good faith that are relevant to FPC's determination of where the public interest lies and that Cities says that all their acts and actions were in good faith and were necessary for the protection of Cities' customers. The jury was instructed if it so finds to return a verdict for Cities.

Instruction No. 10 told the jury to find for Cities if the jury found that regardless of any act of any kind by Cities including the steps taken by Cities relating to Westerns' amended application to terminate deliveries to Cities, Western could not have received permission from FPC to terminate deliveries to Cities on or before January 1, 1963.

Instruction No. 11 states the statutory definition of a contract, how it may be explained and what is implied in a contract if not expressed and that implied in every contract is the obligation of each contracting party to refrain from doing anything that impedes performance or make it more difficult.

Instruction No. 12 contained the statutory provisions for the measure of damages in case of a breach of the contract and the statement of the measure appearing in Eason Oil Company v. Whiteside, supra.

Instruction No. 13 told the jury to find for Western if it found Cities acted in bad faith in opposing Western's application to abandon service to Cities and hindered Western in the prosecution of such proceedings.

Instructions Nos. 14, 15, 16 and 17, were conventional instructions pertaining respectively to (a) the weight and importance to be given the testimony of expert witnesses; (b) the relation between the proximate re-

sult of contract violation and damages; (c) the assessment of damages, if any, that are clearly ascertainable both in their nature and origin and are the proximate result of defendants conduct but which must not be oppressive or unconscionable and must not have been caused more than 5 years prior to November 26, 1966.

Instruction No. 17 was the conventional closing instruction including the significance of the court's rulings in the reception of evidence, what the jury must consider as the fact finders and that the court's instructions contain all the law of the case and that the instructions should be considered as a whole.

Instruction No. 18 was given as the result of an oral inquiry by the jury concerning the application of the statute of limitations.

Instructions Nos. 9 and 10 presented clearly Cities' basic defense and considering Nos. 9 and 10 and 13 together, Cities' duty to cooperate, within the context of this case, was to make a full and fair disclosure of facts in good faith that are relevant to FPC's determination of where the public interest lies. To have given Cities' 49 requested instructions would have made it difficult, if not impossible, for the jury to have considered all the instructions as a whole and would have given undue emphasis to Cities' defense.

In our opinion the instructions are clear and unambiguous and when taken as a whole were not confusing to the jury.

█ The judgment rendered against Cities bears interest at 10% per annum from date of judgment. Cities asks us to hold unconstitutional 15 O.S.1961, § 274 (Supp.1969) providing that all judgments of courts of record shall bear interest at the rate of 10% per annum from date of judgment with exceptions not material here. Cities says § 274 violates that part of the Oklahoma Constitution dealing with banks and banking, more specifically Art. XIV, § 2, that fixes the legal and maximum contract rate of interest. Cities cites no authority indicating why a constitution-

al provision prescribing the contract rate of interest inhibits legislation fixing rates of interest on judgments of courts of record. Under such circumstances the presumption in support of constitutionality is an adequate basis for rejecting, and we do reject, Cities' contention. Application of Oklahoma Capitol Improvement Auth., Okl., 355 P.2d 1028.

Cities claims that the trial court erred in both the admission and rejection of evidence, in permitting the asking and answering of improper hypothetical questions. Our examination of the record leads us to conclude that the trial court may have erred, in 'a highly technical sense, in certain rulings in these areas. Applying 20 O.S.1971, § 3001, we are not of the opinion that such errors resulted in a miscarriage of justice or constituted a substantial violation of a constitutional or statutory right that inheres in Cities. Neither do we conclude in the light of 12 O.S.1971, § 78, that such errors affected the substantial rights of Cities.

Finding no reversible error, we affirm the judgment of the trial court.

All Justices concur.