CITIES SERVICE GAS COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

Western Natural Gas Company, and Atlantic Richfield Company, Respondent, Intervenors.

No. 75–1291.

United States Court of Appeals, District of Columbia Circuit.

Argued 23 Feb. 1976.

Decided 29 April 1976.

Melvin Richter, Washington, D.C., with whom Harry S. Littman, Dale A. Wright, Washington, D.C., and Daniel R. Hopkins, Oklahoma City, Okl., were on the brief for petitioner.

Philip R. Telleen, Atty., Federal Power Commission, Washington, D.C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel and Allan Abbot Tuttle, Sol., Washington, D.C., were on the brief for respondent. John R. Staffier, Atty., Federal Power Commission, Washington, D.C., also entered an appearance for respondent.

Carroll L. Gilliam, Washington, D.C., with whom Keith R. McCrea and John C. Dawson, Washington, D.C., were on the brief for intervenor, Western Natural Gas Co.

Charles E. McGee, Washington, D.C., with whom Edward J. Kremer, Jr., and David Aston, Dallas, Tex., were on the brief for intervenor, Atlantic Richfield Co.

Before MacKINNON and WILKEY, Circuit Judges, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioner, Cities Service Gas Company (Cities) asks this court to set aside two unreported Federal Power Commission orders—one dated 23 January 1975,[1] which terminated FPC Docket No. RI60–213 [2] and permitted Western Natural Gas Company (Western) and Atlantic Richfield Company (ARCO) to make refunds to Cities pursuant to the area rate determination in Opinion No. 586,[3] and a second dated 18 March 1975,[4] which denied Cities' application for rehearing. In essence, Cities contends that Opinion No. 586, the area rate decision prescribing just and reasonable rates and refund liabilities for all producers in the Hugoton-Anadarko Area, should not apply to Cities' purchases of natural gas from Western and Western's successors between 1960 and 1968. According to Cities, the Commission erred in terminating the separate proceeding dealing with these sales (Docket No. RI60–213) and applying the area rate and refund provisions of Opinion No. 586 without a separate, formal hearing on the applicability of that opinion to the circumstances of this particular case. Cities' arguments require reference to an earlier contractual relationship between Cities and Western, to proceedings before the FPC and the Oklahoma courts, and to ARCO's ultimate acquisition of Western's properties:

1. *1949 Contract and 1955 Certificate* —In 1949 Western and Cities entered into a contract whereby Western agreed to sell natural gas that it produced from the Kansas Hugoton Field to Cities, the owner and operator of an interstate gas pipe line system.[5] The contract price was 7.15 cents per Mcf (at 14.65 psia) and the contract term was ten years (1 April 1950–1 April 1960). In addition, the contract was subject to a prior right of call based on an antecedent agreement between Western and El Paso Natural Gas Company (El Paso), *i. e.,* El Paso had the right to replace Cities as purchaser of the gas from the Kansas Hugoton Field.

In 1954, after the Supreme Court affirmed the FPC's jurisdiction over interstate producer sales of natural gas,[6] Western filed for a certificate of public convenience and necessity covering its sales to Cities under the 1949 contract and tendered that contract as a rate schedule.[7] The FPC accepted the 1949 contract as Western's

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. Order Terminating Proceeding, in Part, and Requiring Refunds (23 Jan. 1975), Joint Appendix (J.A.) at 265–69.

2. Docket No. RI60–213 involved a unilateral rate increase filed by one of Cities' suppliers, Western Natural Gas Company. The increase was suspended for five months by the Commission and then, on 1 September 1960, placed in effect subject to refund.

3. Area Rate Proceeding (Hugoton-Anadarko Area), Docket No. AR64–1, 44 F.P.C. 761 (18 Sept. 1970), *aff'd, In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974 (9th Cir. 1972).

4. Order Denying Rehearing (18 Mar. 1975), J.A. at 300–05.

5. Gas Purchase Contract, *id.* at 15–30.

6. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

7. J.A. at 1–45.

rate schedule[8] and on 16 September 1955 issued Western a certificate.[9]

2. *Western's Unilateral Filing*—On 26 February 1960 Western filed with the FPC its intention to raise the rate paid by Cities to 15 cents per Mcf as of 1 April 1960, the day the ten year term of the 1949 contract expired.[10] At this time El Paso was attempting to exercise its right to replace Cities as purchaser of Western's gas, and Western had applied to the FPC for permission to abandon service to Cities (Docket No. G–18662) and for a certificate to serve El Paso (Docket No. G–18661). Cities, however, was opposing both the requested abandonment and the proposed rate increase.[11]

On 25 March 1960 the FPC issued an order (1) permitting Western's rate increase filing and designating it Docket No. RI60–213, (2) allowing the 15 cent rate to become effective, subject to refund, after a five month suspension, and (3) setting the issue of the rate's lawfulness for hearing pursuant to section 4(e) of the Natural Gas Act.[12] On 2 May 1960 Cities intervened in Docket No. RI60–213.[13]

3. *Sale of Western's Properties to Sinclair and Sinclair's Acquisition by ARCO* —Western collected the increased 15 cent rate from 1 September 1960 until 1 July 1963, when Western sold its properties to Sinclair. Thereafter, Sinclair collected the 15 cent rate. Finally, ARCO, through a merger with Sinclair in March 1969, acquired Sinclair's properties and briefly collected the 15 cent rate until 27 April 1969, when ARCO terminated deliveries to Cities and commenced deliveries to El Paso pursuant to previous FPC authorization.[14]

4. *Area Rate Proceeding*—By order issued 27 November 1963[15] the FPC instituted an area rate proceeding, Docket No. AR64–1, for the Hugoton-Anadarko Area, which includes the area producing the gas here at issue. Docket No. RI60–213, under which Cities had been paying 15 cents per Mcf, subject to refund, since 1 September 1960, was consolidated into this area rate proceeding. After hearings, a decision by the Presiding Examiner,[16] oral argument before the FPC, settlement conferences, and an amended settlement proposal,[17] the FPC finally issued Opinion No. 586 on 18 September 1970, establishing the just and reasonable area rate for the Hugoton-Anadarko Area and procedures for appropriate refunds.[18]

On 19 October 1970 Cities filed for a limited rehearing of Opinion No. 586, arguing that a separate evidentiary hearing was needed because of the special and unique circumstances involved in Docket No. RI60–213.[19] On 13 November 1970 the FPC

8. Letter Order (8 Mar. 1955), *id.* at 54–55.

9. Findings and Order Issuing Certificate, Docket No. G–4882 (16 Sept. 1955), *id.* at 56–59.

10. Supplement No. 5 to Western Natural Gas Co. FPC Gas Rate Schedule No. 17, *id.* at 46–53.

11. Cities Service Gas Co. Response to Notice of Price Effective 1 April 1960 (9 Mar. 1960), *id.* at 60–63.

12. Order Permitting Filing, Providing for Hearing and Suspension of Proposed Changes in Rates, and Allowing Increased Rate to Become Effective Subject to Refund, Docket No. RI60–213 (25 Mar. 1960), *id.* at 66–71. *See* Natural Gas Act § 4(e), 15 U.S.C. § 717c(e) (1970).

13. Cities Service Gas Co. Petition to Intervene (received 2 May 1960), *id.* at 72–76.

14. Opinion No. 527 (15 August 1967), *id.* at 116–52.

15. Order Instituting Area Rate Proceedings, 30 F.P.C. 1354 (1963).

16. Initial Decision of the Presiding Examiner on Hugoton-Anadarko Area Rates, 44 F.P.C. 824 (1968).

17. Cities reacted to the amended settlement proposal (filed on 29 January 1970 by various independent producers) by filing a response that supported the agreement, but opposed its application to Docket No. RI60–213 because, according to Cities, unique considerations required a separate disposition in that proceeding. Cities Service Gas Co. Response to Amended Settlement Proposal (received 2 Mar. 1970), J.A. at 306–15.

18. Opinion No. 586, 44 F.P.C. 761 (1970).

19. Cities Service Gas Co. Application for Limited Rehearing of Opinion No. 586, as modified, and Motion for Severance of Docket No. RI60–213 from this Consolidated Proceeding (received 19 Oct. 1970), J.A. at 153–67. In this filing Cities also moved "that upon rehearing . . . the Commission enter an order sever-

granted Cities' request for a limited rehearing "[s]olely to permit the Commission to give full and adequate consideration to the complicated situation posed in connection with Docket No. RI60–213. . . ."[20] Opinion No. 586 was appealed to the Ninth Circuit by parties other than Cities and was affirmed on 31 July 1972.[21]

5. *Oklahoma State Court Proceedings* —In 1966 Western brought suit against Cities in the District Court of Oklahoma County, Oklahoma, alleging that Cities' opposition to Western's request for permission to abandon deliveries to Cities breached a continuing express and implied obligation to carry out the termination provisions of the 1949 contract and to cooperate in obtaining any necessary government approval. In addition, Western alleged that Cities' interference with the earlier contractual arrangement between Western and El Paso was in bad faith and had considerably diminished the value of Western's leasehold interests. The jury awarded Western damages in the amount of $5,026,626, and the Supreme Court of Oklahoma affirmed the judgment of the state district court.[22] The United States Supreme Court dismissed Cities' appeal and denied certiorari.[23]

6. *FPC Orders Under Review*—On 11 November 1974 Western renewed an earlier request to the Commission that Docket No. RI60–213 be terminated and refunds be allowed pursuant to the area rate determination, Opinion No. 586.[24] Western argued that the Commission's order in Docket No. RP71–106 (1973 Phase), wherein the FPC approved a recovery by Cities from its customers of part of the Oklahoma court judgment, resolved the issues (inconsistency with the Oklahoma judgment, double payments, and inapplicability of Opinion No. 586's rate and refund provisions)[25] raised by Cities in its answer to Western's earlier request for termination and refund approval. Similarly, on 26 November 1974 ARCO petitioned the FPC, arguing that the order in Docket No. RP71–106 (1973 Phase) had rendered Cities' previous arguments moot.[26] Cities did not answer these filings. Thereafter, on 23 January 1975 the FPC issued the first order here under review. Noting that Cities had not responded to the November 1974 filings of Western and ARCO, the Commission pointed to its order in Docket No. RP71–106 (1973 Phase) and concluded that the questions raised by Cities in its earlier filings were resolved therein. Accordingly, the FPC ruled that the rate ceiling and refund provisions prescribed in Opinion No. 586 were applicable to Docket No. RI60–213.[27]

On 24 February 1975 Cities applied for a rehearing, asserting that in the 23 January order the FPC had misconstrued the effect of its order in Docket No. RP71–106 (1973 Phase) on the special and unique circumstances involved in Docket No. RI60–213, i. e., on the issues of inconsistency with the

ing said Docket No. RI60–213 from Docket No. AR64–1, and that it institute proceedings in such separate Docket No. RI60–213 for determination of just and reasonable rates applicable thereto." *Id.* at 165. Of course, since no rehearing was held, no severance was ever granted.

20. Order Denying Petitions for Rehearing and Granting Limited Rehearing for Purposes of Reconsideration, Docket No. AR64–1 (13 Nov. 1970), *id.* at 192–93.

21. *In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974 (9th Cir. 1972).

22. *Western Natural Gas Co. v. Cities Serv. Gas Co.,* 507 P.2d 1236 (Okl.S.Ct.1972).

23. 409 U.S. 1052, 93 S.Ct. 559, 34 L.Ed.2d 506 (1972).

24. Western Natural Renewal of Petition for Order Accepting Quality Statement and Terminating Limited Rehearing of Opinion No. 586 Granted Cities Service Gas Co. with Respect to Atlantic Richfield Docket No. RI60–213 (received 11 Nov. 1974), J.A. at 258–61.

25. We will focus on these issues in the next three sections of this opinion.

26. Atlantic Richfield Petition for Order Accepting Quality Statement and Terminating Limited Rehearing of Opinion No. 586 Granted Cities Service Gas Co. with Respect to Atlantic Richfield Docket No. RI60–213 (received 26 Nov. 1974), J.A. at 262–64.

27. Order Terminating Proceeding In Part, and Requiring Refunds (23 Jan. 1975), *id.* at 265–69.

Oklahoma judgment, double payments, and inapplicability of Opinion No. 586's rate and refund provisions.[28] In response, on 18 March 1975 the Commission issued the second order here under review, denying Cities' application for rehearing. Explaining that Cities had been remiss in not answering the November filings by Western and ARCO, the FPC shifted from the rationale of its 23 January order (*i. e.,* the FPC no longer relied on its order in Docket No. RP71–106 (1973 Phase)) and specifically rejected Cities' three closely related arguments.[29]

On 24 March 1975 Cities filed for review in this court, again asserting that the FPC erred when it denied separate consideration and a formal hearing on the following "special and unique" circumstances surrounding the Western-Sinclair-ARCO gas sales to Cities: (1) the inequitable inconsistency between Western's unilateral rate filing and the Oklahoma judgment, (2) the double payment burden thrust upon Cities and its customers by the rate and refund provisions of Opinion No. 586, and (3) the general inapplicability and inequity of Opinion No. 586.

Tested against these objections, we find that the FPC acted correctly. Moreover, we note that the "special and unique" circumstances cited by Cities did, in fact, receive separate FPC consideration, although the Commission finally concluded that they did not merit a separate evidentiary hearing. Accordingly, we affirm the Commission orders challenged herein.

I. *Inconsistency Between Western's Unilateral Filing and the Oklahoma Judgment*

Cities contends that a separate formal hearing and additional consideration are required to determine whether Western's unilateral rate filing on 26 February 1960 and the Oklahoma judgment[30] are inconsistent, and if so, whether the inequity inherent in this inconsistency requires the FPC to redetermine the appropriate rates and refunds for the gas sold to Cities by Western and its successors. In other words, Cities contends "that irrespective of whether the Oklahoma decision was right or wrong, it constituted a decision by a court of competent jurisdiction on a very point in a controversy between the same parties and hence is binding under established principles such as res judicata and collateral estoppel."[31]

On the other side of this issue, Western, ARCO, and the Commission assert that there is no inconsistency (inequitable or otherwise) between the Oklahoma decision and Western's position there or before the FPC; hence, this question requires no separate hearing and consideration.

We agree with the Western–ARCO–FPC position. Western's 1960 filing of a unilateral rate increase was in complete accord with settled law. What Cities overlooks is the legal effect of the 16 September 1955 certificate of public convenience and necessity, issued by the FPC following Western's filing of the 1949 contract as a rate schedule. Until the 1954 *Phillips Petroleum Co. v. Wisconsin*[32] decision, that contract was all that was necessary to regulate the obligations of the parties; after *Phillips* an FPC certificate was necessary to legitimatize the delivery of the interstate gas. True, the contract expired, but the obligation of Western and Cities imposed by the Natural Gas Act and exemplified by the certificate survived.

During the ten-year term of the 1949 contract between Cities and Western, private contractual provisions governed the specific rates and rate increases that could

---

**28.** Cities Service Gas Co. Application for Rehearing (received 24 Feb. 1975), *id.* at 270–77.

**29.** Order Denying Rehearing (18 Mar. 1975), *id.* at 300–05.

**30.** Supplement No. 5 to Western Natural Gas Co. FPC Gas Rate Schedule No. 17, *id.* at 46–

53; *Western Natural Gas Co. v. Cities Serv. Co.,* 507 P.2d 1236 (Okl.S.Ct.1972).

**31.** Reply Brief at 5.

**32.** 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

be filed by Western under section 4 of the Natural Gas Act, 15 U.S.C. § 717c (1970).[33] Upon expiration of the contract's stated term on 1 April 1960, Western (and its successors) had to continue deliveries to Cities until the Commission authorized a cessation of deliveries under section 7(b) of the Act, 15 U.S.C. § 717f(b) (1970). However, when the term expired Western could, and did, file a unilateral increase under section 4.[34] When such unilateral filings are received, the Commission may (1) permit effectiveness upon expiration of the notice period, or (2) suspend effectiveness, provide for a hearing on reasonableness, and permit the increase to go into effect subject to refund.[35] Here, the FPC chose the latter course of action, suspending Western's 1960 filing for five months under section 4(e), thereafter permitting effectiveness subject to refund, and providing for a hearing on the just and reasonable rate level.

The alleged inconsistency between Western's unilateral rate filing and its position before the Oklahoma courts and the FPC stems from a misunderstanding of the Oklahoma decision. The Oklahoma courts did not decide "a very point in controversy between the same parties." [36] In the Oklahoma suit Western's claim was for breach of contractual obligations. Cities was opposing Western's application to the Commission for authorization to cease deliveries to Cities, and Western contended that this opposition breached an implied contractual duty of cooperation that continued after the contract expired. Since the 1949 contract with Cities was expressly subject to El Paso's right of first call,[37] Western and the Oklahoma jury reasoned that Cities had implicitly agreed not to interfere with or oppose El Paso's and Western's prior contractual arrangement. Although passage of the Natural Gas Act (specifically section 7(b)) may have given Cities an effective means by which it could frustrate El Paso's prior contractual rights and prevent Western from entering into a more lucrative arrangement with El Paso, the Oklahoma jury and courts found that the Act did not shield Cities from breach of contract liability.

In its 18 March order the FPC correctly distinguished between Cities' obligation under the Act to pay the just and reasonable rate for gas delivered to it (the issue before the Commission) and Cities' separate and independent obligation to respond in damages for private contractual breaches (the issue before the Oklahoma courts):

> We are concerned here with jurisdictional sales made after the termination date of the contract and the price to which Western is entitled with respect to such sales, not with the breach of implied contractual obligations. In determining that Western's contract was extended beyond its termination date by the provisions of the Natural Gas Act, the Court in the *Western* case [the Oklahoma case] . . . did not reach the issue in this case. We therefore reject Cities' claim that such decision limits Western to its contract rate subsequent to the termination date in its contract.[38]

It should also be recognized that the Oklahoma courts found that Cities acted in bad faith; they did not hold Cities liable for breach of contract damages solely because Cities chose to exercise the "rights" conferred upon it by the Natural Gas Act (although, this alone might have sufficed). Pertinently, the Oklahoma Supreme Court concluded:

---

**33.** *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

**34.** *United Gas Pipe Line Co. v. FPC,* 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 281 (1966); *Sunray Mid-Continental Oil Co. v. FPC,* 364 U.S. 137, 155, 80 S.Ct. 1392, 1402, 4 L.Ed.2d 1623, 1635 (1960); *Continental Oil Co. (Operator),* 29 F.P.C. 525, 526 (1963).

**35.** *United Gas Pipe Line Co. v. FPC,* 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 281 (1966).

**36.** Reply Brief at 5.

**37.** Gas Purchase Contract, J.A. at 15 & 30.

**38.** Order Denying Rehearing (18 Mar. 1975), *id.* at 304.

Cities could have forestalled the devastating delays caused by its unlawful assertions by disclosing to the FPC at any time in the public interest that Cities did not need Western's gas. Instead there was a continuing violation by Cities of its continuing covenant.[39]

Cities did not need Western's gas because during this period Cities had considerable accumulated under-production in the Kansas Hugoton Field.[40] Therefore, according to Western, Cities' delaying tactics before the FPC forced the public interest, as well as Western's economic interests, to play second fiddle to Cities' greed.

Cities' misunderstanding of the Oklahoma ruling (and Western's position there and before the FPC) is brought into sharp relief when Cities asserts,

> It was the holding of the Oklahoma Supreme Court . . . and ultimately, the position of Western, that the various obligations and restraints (*including price*) provided in the contract remained

fully operative after the termination date provided therein.[41]

In simple mathematical terms, Cities urges the FPC and this court to adopt the following equation as the only equitable formula for computing the refunds which Western and ARCO owe to Cities: (15¢ per Mcf) − (7.5¢ per Mcf) = refund payable to Cities by Western and its successors. The first figure (15¢ per Mcf) derives from Western's unilateral rate filing, *i. e.*, the increase which the FPC permitted to become effective subject to refund. The second figure (7.5¢ per Mcf) is, of course, the rate agreed to in the 1949 contract, which, according to Cities' interpretation of the Oklahoma Supreme Court's "binding" decision, "remained fully operative after the termination date" of the contract.

Contrary to Cities' reading of the Oklahoma case, the court there only held that "[d]eliveries of natural gas continued . . under the applicable provisions of the 1949 Contract, *as modified by the Natural Gas Act,*" and "that the existing applicable law

**39.** *Western Natural Gas Co. v. Cities Serv. Co.,* 507 P.2d at 1242.

**40.** Russell V. Hoffsess, the Vice President of Cities, who was responsible for the administration of the 1949 contract, made the following reference to this "considerable accumulated under-production" in a memorandum to G. C. Roth, another Cities Vice President:

> It does not appear at this time that in light of El Paso's prior claim to this gas and their offer of 21¢ for it at Dumas that it would be possible for us to extend the contract. It is my belief that Mr. Weaver [a Vice President of Western] was notifying us in good faith of their intention to disconnect it from us and deliver it to El Paso in the event they are able to get Federal Power approval. It appears to me that our only chance to retain this gas is to object to their discontinuance of service to us and obtain a Federal Power Commission order requiring that it be left connected to our system. We are at somewhat of a disadvantage in making our position with the Commission at this time since we have considerable accumulated under-production in the Kansas-Hugeton [*sic*; Hugoton] Field due partly to our being connected to more gas per demand on the field than the average of other companies in the field.
> I am furnishing the Legal Department with a copy of this memorandum and I recom-

mend we make preparation to oppose Western Natural's application when it is filed. Quoted in *Western Natural Gas Co. v. Cities Serv. Co.,* 507 P.2d at 1245. The Oklahoma Supreme Court also made the following observation:

> . . . Cities' aggregate under-production from the producing gas wells to which Cities was connected amounted to 313.8 billion cubic feet by 1968 which exceeded by 76 billion cubic feet Cities' estimate of Western's entire Kansas-Hugeton [*sic*; Hugoton] reserves. This means that with the loss of Western's gas reserves, Cities, contrary to what was alleged in its petition in intervention would not have to look elsewhere for gas.
> *Id.* at 1249.

**41.** Initial Brief for Cities at 15 (emphasis added). Two pages later in its brief, Cities repeats the same assertion:

> [I]n view of the binding nature of the [Oklahoma court's] determination that the Western-Cities contract continued in existence notwithstanding the expiration date set forth in the contract, *the contract price provided in the contract likewise remained in effect* and Western could not be permitted to increase that price unless the Commission found after hearing that the contract price was unjust and unreasonable under the Natural Gas Act.
> *Id.* at 17 (emphasis added).

is a part of every contract, the same as if expressly referred to or incorporated in its terms." [42] Under applicable law, after the 1949 contract expired Western was entitled to change its rate schedule at will, subject to FPC approval,[43] but Western was not entitled to abandon its deliveries to Cities without prior express authorization from the FPC.[44] In addition, under the 1949 contract (and its continuing implied covenants) Western was entitled under Oklahoma law to Cities' cooperation in seeking FPC authorization to abandon service to Cities, i. e., to a full and fair disclosure by Cities of the facts relevant to the FPC's determination of how the public interest could best be served. This was the holding of the Oklahoma courts and the *consistent* position of Western before those courts and the Commission. While the Commission's 23 January order misses the mark on this issue, its 18 March order adequately considers and clearly explains the Commission's position on this issue.

■■■ In summary, since the subject matter and issues before the Oklahoma courts were related to, but nonetheless different and distinct from, the subject matter and issues before the FPC, the doctrines of res judicata and collateral estoppel have no application here. Similarly, because Western did not pursue in these two forums inconsistent remedies under inconsistent theories, the doctrine of equitable estoppel has no applicability. The following conclusions of the Oklahoma courts and the FPC are completely consistent: Enforceable contractual obligations survived the expiration date of the 1949 contract, and at the same time the Natural Gas Act permitted a unilateral filing by Western and a subsequent FPC determination of the just and reasonable rate.

II. *Double Payments*

Cognizant that this court might not find an inequitable inconsistency between West-

ern's unilateral rate filing and the Oklahoma judgment, Cities argues in the alternative that a separate formal hearing and additional consideration are required to determine whether the refund provisions of the area rate proceeding (Opinion No. 586) place an inequitable "double payment" burden upon Cities and its customers. Cities explains that Western's recovery in the Oklahoma suit was based on the assumed receipt by Western of only 11 cents per Mcf for gas delivered to Cities after 1 January 1963, whereas the amount of refunds due Cities under Opinion No. 586 was based on a 12.5 cents per Mcf rate paid by Cities to Western. According to Cities, this results in a 1.5 cents per Mcf overpayment or "double payment" to Western and its successors. When we reduce Cities' double payment argument down to rough mathematical terms, we get the following equations:

*THE DAMAGES FORMULA—*

(a) that was used by the Oklahoma courts:

$(14.5¢$ per $Mcf)—(11¢$ per $Mcf) =$ damages payable to Western

(b) that, according to Cities, should have been used by the Oklahoma courts:

$(14.5¢$ per $Mcf)—(12.5¢$ per $Mcf) =$ damages payable to Western

*Result of applying Cities' formula* : a lower damages award payable to Western by Cities

*THE REFUND FORMULA—*

(c) that was used by the FPC in Opinion No. 586:

$(15¢$ per $Mcf)—(12.5¢$ per $Mcf) =$ refunds payable to Cities

(d) that, according to Cities, should be used by the

FPC in Docket No. RI60–213:

$(15¢$ per $Mcf)—(11¢$ per $Mcf) =$ refunds payable to Cities

**42.** *Western Natural Gas Co. v. Cities Serv. Co.*, 507 P.2d at 1240–41 (emphasis added).

**43.** Natural Gas Act § 4, 15 U.S.C. § 717c (1970).

**44.** Natural Gas Act § 7(b), 15 U.S.C. § 717f(b) (1970).

*Result of applying Cities' formula*: a higher refund payable to Cities by Western

Thus, whether the Oklahoma court award or the FPC refund formula is deemed in error and is to be corrected, Cities is out 1.5 cents per Mcf and is due that much. Since the Oklahoma court award is final, the only place where the appropriate correction can be made is in the FPC proceedings. So goes Cities' argument.

We derive the figures (*i. e.*, rates) used in these four equations from the following sources:

(14.5¢ per Mcf) = the market value of Western's gas reserves, if disconnected from Cities on 1 January 1963 and sold in a new market pursuant to a renegotiated contractual arrangement between Western and El Paso (14.5¢ per Mcf was the price stipulated in a contract renegotiated by Western and El Paso in 1962.)

(11¢ per Mcf) = the market value of Western's gas reserves, assuming Western's continued deliveries to Cities (11¢ per Mcf was the estimate suggested by Western's valuation expert, Derrick, in the Oklahoma trial court.)

(12.5¢ per Mcf) = the just and reasonable rate for the gas severed and sold to Cities by Western, as determined by the FPC in its area rate proceeding, Opinion No. 586

(15¢ per Mcf) = the increased rate unilaterally filed by Western and permitted to become effective, subject to refund, by the FPC

The measure of damages urged by Western's valuation expert, Derrick, in the Oklahoma trial court was "the difference between the market value [11¢ per Mcf] of Western's Kansas-Hugeton [*sic*; Hugoton]

gas reserves assuming Western's continued deliveries to Cities and their market value [14.5¢ per Mcf] on January 1, 1963, if disconnected from Cities on that date . . . " and sold to another pipeline pursuant to a renegotiated contractual arrangement between Western and El Paso.[45] Since the jury ignored two other expert recommendations and awarded Western almost the exact sum recommended by the expert witness, Derrick (recommendation—$5,026,626.*67*; damages awarded—$5,026,-626.*00*), Cities argues that the jury must have accepted Derrick's 11 cents per Mcf rate assumption.

While we accept the logic and correctness of Cities' argument up to this point, we are not sure where it leads us. Apparently, Cities contends either (1) that the Oklahoma jury (and Derrick and Western) should have been foresighted enough to know that the FPC in a *subsequent* area rate proceeding would determine the just and reasonable rate to be 12.5 cents, not 11 cents, per Mcf (*i. e.*, that the Oklahoma courts should have used equation (b) *supra* to calculate Western's damages) or (2) that after this gas was severed and sold, the FPC was somehow bound by Derrick's estimate of *future* rates, since this estimate obviously was accepted by the Oklahoma jury (*i. e.*, that the FPC should use equation (d) *supra* to calculate Cities' refund). We can accept neither proposition.

▉ To be sure, the price per Mcf of Western's gas, if deliveries continued to Cities, was one important factor in the Oklahoma jury's determination of a proper measure of damages. However, other equally important factors included the volume of Western's gas reserves; future operating expenses; future excise, property, and income taxes; and the discount factor used to compute present worth.[46] Since the

**45.** *Western Natural Gas Co. v. Cities Serv. Gas Co.*, 507 P.2d at 1247.

**46.** The Oklahoma Supreme Court's description of the valuation testimony received by the trial court details the many uncertain factors that went into each expert's calculations:

Western's experts on valuation used the method employed by all valuation engineers including Cities' experts for determining the amount of reserves owned by Western in both the Chase reservoir and the underlying Council Grove reservoir. This method is generally referred to as the "pressure decline method." It calls for the application of

Oklahoma courts and the FPC were confronted with separate and distinct issues— the former involving Cities' responsibility in a breach of contract suit for damages caused to Western's leasehold interests and the latter involving Cities' obligations under the Natural Gas Act to pay the just and reasonable rate for gas severed and delivered to it—we find no support for Cities' assertion that, as a matter of equity, the FPC was bound to accept the 11 cents per Mcf rate used by the Oklahoma jury to determine damages.

■ Here Cities "pays" the just and reasonable rate by receiving refunds based on a 12.5 cents per Mcf rate. If the FPC had set 11 cents per Mcf as the just and reasonable rate, then, of course, Cities would have been entitled to a greater refund (1.5 cents per Mcf more). Thus, Cities is, in effect, arguing that the Oklahoma damages were excessive and that the FPC should order a "remittitur" in the form of a larger refund. We disagree for two reasons. In the first place, we do not understand why the Oklahoma damages become "excessive" just because one of several uncertain factors turns out to have been underestimated. What if it turns out that the volume of Western's gas reserves (or some other factor) was also incorrectly estimated? Then, it is possible that the jury's damage award not only was *not* excessive, but was inadequate, despite the use of an 11 cents per Mcf rate. Secondly, we conclude that requiring such a "remittitur" is not a proper function of the FPC. Even if the damages in Oklahoma were excessive, they can not be used as

Boyles Law, which is that the volume of gas varies inversely with the pressure. The decline in reservoir pressures and the volume of gas taken from the reservoir over the period of decline constitutes the basis for determining the volume of gas reserves remaining in the reservoir. This data is required to be filed by producers of gas with the State Commissions having control and supervision over natural gas production. What volume will be produced over the life of the contract, and at what daily or monthly rates, is involved. A price per mcf, increasing in later years according to schedule, is applied to this volume to determine gross income. From gross income accruing over the life of the contract there is deducted (1) the value of 1/8th royalty; (2) expenses for operating the property; (3) excise and property taxes. This calculation produces net income over the life of the contract. Net income is then reduced to present worth by the use of a discount factor (6%). This discount factor represents the interest rate prevailing at the time it is used. Finally to allow for a profit margin and income taxes the present worth amount is reduced by 33⅓%.

According to Western's valuation expert, Derrick, (P. Ex. 83) using this method for determining what value or price a willing buyer and a willing seller would arrive at, Western's gas if sold under the El Paso-[Western renegotiated] contractual arrangement would make Western's property worth $116,707,330 as of January 1, 1963, and worth only $9,958,420 if Western's gas is continued to be sold under the 1949 Contract with Cities, representing a difference in value of $6,748,910. On the other hand Cities [*sic*] valuation experts (D. Ex. 93) concluded that

Western's Kansas-Hugeton [*sic*] gas reserves as of January 1, 1963, would be worth $5,675,627 if sales are continued to Cities Service and worth only $4,738,186 if Western's gas is sold under the Western-El Paso contract of January 30, 1962. Each expert assumed deliveries at differing rates and at different prices from January 1, 1963 to January 1, 1983. Obviously, *differences in the application of price, volume, rates of withdrawal, operating expenses, unusual operating conditions and other differences explains [sic] the difference in the results of the rival experts.* Derrick, Western's expert, used a price of 14½¢ per mcf for Chase gas which was the price stipulated in the El Paso Western renegotiated contract of 1962, escalating 1¢ per mcf each 5 years. On the assumption that Chase gas would continue to go to Cities, Derrick used 11¢ mcf [*sic*] and for Council Grove gas 16¢ per mcf, without escalation was used. Beebe, another valuation expert for Western, agreed with Derricks' [*sic*] valuations. Houser, a valuation expert for Western, using slightly different prices, arrived at $7,397,772 as the figure which represented the greater value of Western's reserves if produced and sold under the renegotiated contract of January 30, 1962, between Western and El Paso rather than under the contract of 1949 between Western and Cities. The jury's finding was $5,026,626.

*Id.* at 1247–48 (emphasis added). As we mentioned earlier, the jury's finding of $5,026,626, was only 67 cents off Derrick's estimate of damages attributable to Western's Chase reservoir. Since the jury awarded no other damages, presumably it found that Cities was not liable for damages to Western's underlying reservoir, Council Grove.

some sort of "set-off" against Cities' independent statutory obligation to pay the Commission-prescribed just and reasonable area rate for gas delivered and sold.[47] The Commission is a federal administrative agency, not an appellate tribunal. On the issue of excessive damages, Cities has had its day in court and all the appellate review to which it is entitled.[48]

III. *Applicability of the Area Rate and Refund Determination (Opinion No. 586)*

In Cities' final attempt to secure from the FPC a separate formal hearing and additional consideration, it mounts a three-prong attack against the applicability of Opinion No. 586. We find Cities' criticisms of the area rate proceeding to be without substance.

First, Cities argues that the record in the area rate proceeding (Docket No. AR64-1) has no "appropriate evidence with regard to the Western-Atlantic [ARCO] sales to Cities."[49] To the contrary, the record of the adjudicatory hearing before the FPC contains extensive exhibits, testimony, and cross-examination relating to such *composite* cost and operating data as that collected by an FPC questionnaire sent to *all* major area producers including Western and its successors.[50] Arguing that this does not constitute "appropriate evidence," amounts to nothing less than a broadside attack on the area-rate method, a method long ago validated by the Supreme Court.[51]

Second, Cities implies that Opinion No. 586 represents merely the FPC's acceptance of the amended settlement proposal to which Cities filed a timely objection. This is not the case at all. Instead, as Western correctly asserts, "The Commission's opinion amply shows that the 'settlement proposal' was but part of what the Commission considered, and that its decision on the merits also was based on the record, its findings, the Examiner's findings and all the pleadings."[52]

Finally, Cities focuses upon the forgiveness provisions of Opinion No. 586 and contends that these refund provisions were (and should be) limited to the "peculiar situation" of Phillips Petroleum Company.[53] Again, this amounts to a general attack on

---

**47.** *Cf. The Jupiter Corp.,* 39 F.P.C. 854, 855 (1968), where the Commission declined to undertake resolution of certain issues involving questions of private contract law, stating that amounts due or collected by judicial proceedings for nonjurisdictional liabilities " . . . may not be comingled or confused with amounts due for jurisdictional services . . . ." Likewise, the damages awarded in the nonjurisdictional Oklahoma judgment should not be comingled or confused with the jurisdictional rates and refunds prescribed in Opinion No. 586.

**48.** *See Western Natural Gas Co. v. Cities Serv. Gas Co.,* 507 F.2d 1236 (Okl.S.Ct.), *appeal dismissed and cert. denied,* 409 U.S. 1052, 93 S.Ct. 559, 34 L.Ed.2d 506 (1972).

**49.** Initial Brief for Cities at 23.

**50.** *See* 30 F.P.C. 1354, 1355 (1963); Opinion No. 586, 44 F.P.C. 761 (1970); Initial Decision of the Presiding Examiner on Hugoton-Anadarko Area Rates, 44 F.P.C. 824 (1968).

**51.** In the *Permian Basin Area Rate Cases* Justice Harlan explained,

The Commission has asserted, and the history of producer regulation has confirmed, that the ultimate achievement of the Commission's regulatory purposes may easily depend upon the contrivance of more expeditious administrative methods. The Commission believes that the elements of such methods may be found in area proceedings. . . . We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.

390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312, 342 (1968); *accord, Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974).

**52.** Brief for Western at 42. *See* Opinion No. 586, 44 F.P.C. 761, *modified,* 44 F.P.C. 1159 (1970), *aff'd, In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974, 980 (9th Cir. 1972).

**53.** Initial Brief for Cities at 24–25. Opinion No. 586 does not require the refund of all amounts collected in excess of the 12.5 cents per Mcf rate determined to be just and reasonable. Rather, it forgives to area producers all monies collected in excess of 12.5 cents per Mcf for gas delivered from 1 September 1960 to 31 December 1960, and thirty percent of such excess for gas delivered during 1961 and 1962.

the concept of area-rate proceedings. Although Phillips owed the bulk (eighty percent) of the refunds at issue (and therefore, its "peculiar situation" had to be considered), Opinion No. 586 is clearly applicable to *all* producers (829 respondents) in the Hugoton-Anadarko Area. As the Ninth Circuit recognized when it affirmed Opinion No. 586,

> [S]ection 4(e) of the Act, 15 U.S.C. § 717c(e), does not require refunds where unlawful rates have been collected in prior years, but leaves this to the discretion of the Commission.[30] The view that the
>
> [30] Section 4(e) provides in part:
>
> ". . . the Commission *may*, by order, require the natural gas company . . . to refund any amounts ordered by the Commission, . . ." (Emphasis added) [54]
>
> Commission's refund power is discretionary has support in the court decisions. In [*Permian Basin Area Rate Cases*], 390 U.S., at 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 . . . the Supreme Court made it clear that the Commission is free, within the limits imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests. In exercising this discretion it is "the duty of the Commission to look at 'the backdrop of the practical consequences . . .'" of its refund order. *Federal Power Commission v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 155, 83 S.Ct. 211, 216, 9 L.Ed.2d 199 . . . (1962).

In the context of this case we find nothing to suggest that the Commission abused this broad discretion when it decided to apply the rate and refund provisions of Opinion No. 586 to *all* gas sales in the Hugoton-Anadarko Area, including those between Cities and Western (and Western's successors).

**54.** *In re Hugoton-Anadarko Area Rate Case*, 466 F.2d at 990–91 (footnote omitted).

**55.** *See, e. g., Pennsylvania Gas & Water Co. v. FPC*, 150 U.S.App.D.C. 151, 463 F.2d 1242, 1251–52 (1972); *City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 458 F.2d 731, 743–44 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Municipal Light Bds. v.*

## IV. *Conclusion*

 For the reasons stated in the preceding sections of this opinion and summarized below, we conclude that this case falls squarely within the settled rule that where there are no genuine, relevant, material, factual questions in dispute, the FPC may proceed under sections 4 and 5 of the Natural Gas Act without formal evidentiary hearings.[55]

1. As to the alleged inconsistency between the Oklahoma judgment and Cities' unilateral filing—Cities' contentions do not involve factual disputes, but only misinterpretations of (1) the Oklahoma judgment, (2) the Natural Gas Act, (3) Western's position in the Oklahoma courts and before the FPC, and (4) the actual relation between the Oklahoma decision and the issue before the Commission.

2. As to the alleged double payment— Similarly, this contention rests solely upon misinterpretations of the issues before the Oklahoma courts and the FPC, and upon theories irrelevant to rate determinations under the Natural Gas Act.

3. As to Opinion No. 586's inapplicability—This boils down to a general attack on area-rate proceedings and therefore, must be rejected. Different producers and different pipe lines will always face different circumstances. In an area rate proceeding the circumstances of the producer owing the bulk of the refunds (*i. e.*, Phillips in this case) should be given significant weight.

The 18 March order denying rehearing sufficiently clarifies any misunderstanding created by the rationale of the 23 January order. The second order indicates that the Commission did understand and consider Cities' arguments, and it contains an adequate explanation of the Agency's position on these issues.[56] In addition, we note that

*FPC*, 146 U.S.App.D.C. 294, 450 F.2d 1341, 1345–46 (1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972).

**56.** The order's recognition that the Oklahoma courts did not reach or decide the issue before the FPC (*i.e.*, the just and reasonable rate for gas severed and delivered), justified the Commission's rejection of Cities' first two conten-

Cities was partially responsible for the confusion surrounding the Commission's first order, since Cities did not respond to the November 1974 petitions filed by Western and ARCO. The FPC orders challenged herein are

*Affirmed.*

tions (inconsistency between the Oklahoma judgment and Western's unilateral filing, and double payments). The rejection of Cities' third contention (inapplicability of Opinion No. 586) required no explanation; the concept of area rate proceedings is no longer open to general attack and the Commission enjoys a broad range of discretion when it provides for refunds under Section 4(e).